ESTATE OF ELIZABETH L. POWER, KENNETH C. TIFFIN AND SUSAN P. ANNIS, CO-CONSERVATORS, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Power v. Commissioner
Docket No. 585-80.
United States Tax Court
T.C. Memo 1983-552; 1983 Tax Ct. Memo LEXIS 237; 46 T.C.M. (CCH) 1333; T.C.M. (RIA) 83552; September 8, 1983. James B. Tiffin, for the petitioner. Charles W. Maurer, Jr., for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined that Elizabeth L. Power, whose estate is petitioner in this proceeding, had deficiencies in her Federal income taxes as follows: Taxable Year
Ended
Deficiency
June 30, 1972
$8,793.19
June 30, 1973
32,662.29
June 30, 1974
19,342.96
June 30, 1977
5,998.76
The only question for decision is whether Mrs. Power's horse farm was an activity "engaged in for profit," within the meaning of section 183(a)[1], during the years in issue. FINDINGS OF FACT Elizabeth L. Power filed Federal income tax returns for the years in question with the Internal Revenue Service Center in Andover, Massachusetts. At the time her petition in this case was filed, she resided in Ashland, Massachusetts. Subsequent to filing her petition, Mrs. Power died, and her estate succeeded her as a party in this case. For simplicity's sake, *239 however, we will follow the practice of the parties and refer to Mrs. Power as the "petitioner." Petitioner was born in 1903 in Brookline, Massachusetts. During the years in issue, petitioner lived on a farm in Middlesex County, Massachusetts. The land that made up the farm was acquired over a period of time by petitioner's parents, and during the period 1950 through 1972 consisted of land, mostly contiguous, exceeding 500 acres. The original farm house was a wooden structure which was destroyed by fire in 1925. Petitioner's father decided at that time to make the farm his permanent home, and he replaced the destroyed building with a more substantial one. To assist petitioner's mother in dealing with a health problem, he built a so-called "inside riding ring" on the farm, relatively near the main house, so that she could ride horseback regularly, irrespective of the weather. Petitioner was away at college at this time and her participation in the family riding was minimal. Subsequently her father died, and her mother became too sick to ride. The horses her mother owned were disposed of and the riding ring fell into disuse. Following the death of her mother in 1941, petitioner *240 (who had by that time married Davidson Power) moved into the family home, which she had inherited. At that time petitioner was not involved in any activity having to do with horses, nor had she been so involved since she had ridden with her family in her college days. After taking over the family estate, petitioner and her husband started actively to farm the acreage that she owned. They worked much of the land as a commercial fruit orchard. In addition, during this period, petitioner acquired some horses and showed them extensively throughout New England. She also raised dogs, winning many prizes in this activity. In the early 1940's, because of the ill health of petitioner's husband, petitioner closed her stable and devoted her attention to her orchards. She continued, however, to maintain her kennels. Petitioner's orchards, although they produced around 40,000 bushels of apples, peaches, and pears annually, generally operated at a loss. Sometime around 1950, petitioner considered the possibility of raising horses on her farm. The idea of raising horses occurred to her because the farm already had the riding ring and fields on which the animals could be pastured. *241 In 1952, petitioner, her daughter, and her son attended the National Morgan Horse Show and "liked that they saw." In the succeeding months, petitioner purchased several Morgans and began to breed and show the horses under the name "Waseeka Farm" (sometimes hereinafter referred to as Waseeka or the stable). As part of her new venture she added stalls to the side of the riding ring. She also constructed new stalls in other buildings which had previously had other uses. Petitioner's horse-breeding activity was limited to show horses. None of her animals was used for racing. An article on Waseeka Farm appeared in the June 1953 issue of the Morgan Horse Magazine, the official publication of the American Morgan Horse Association, Inc.
Sometime in the early 1960's petitioner employed John Lydon, a trainer with 30 years of experience, to train her horses. Petitioner owned about 8 or 9 horses when Lydon began working for her; the number gradually increased to around 30. Lydon was recognized as "the winningest trainer in the Morgan world." When he left petitioner's employ in 1966, he was succeeded as Waseeka's trainer by his daughter Ginny. Ginny was then succeeded after several years *242 by her sister, Priscilla Lydon O'Connor. Mrs. O'Connor remained in that position until Waseeka's horses were disposed of during the last year here in question; she died soon thereafter. In addition to her trainers, petitioner regularly employed "two boys that always took care of the horses." Petitioner did not personally take part in the care or training of the horses, nor did she ride horses during the period in question. Petitioner and her top employees held regular weekly meetings at which the business of the farm was discussed. They discussed "how we are going to produce things to sell whether it was apples or whether it was horses." Records of petitioner's farming operations, as well as for her household expenses, were meticulously maintained by Kenneth C. Tiffin, her neighbor and attorney. Petitioner's daughter, Susan Annis, also aided petitioner in the management of the stable and sometimes rode the horses in competitions. Petitioner enjoyed great success in showing her horses. An article in the August, 1977 issue of The Morgan Horse described Waseeka Farm as "a show stable dynasty * * * perhaps without equal in the Morgan breed." One horse, in particular, embodied *243 Waseeka's success, a stallion named Nocturne, which was foaled in 1954. In a career in the show ring extending from the year of his birth until his official retirement in 1972, Nocturne achieved recognition as "the champion of champions." His remarkable record is summarized in the 1977 article referred to above: When his showing career was completed, he had won 80% of all the classes he ever entered. With 156 classes to his credit in recognized shows, he was first or champion 124 times. He was second or reserve in 25 events, and was never out of the ribbons in any class. Included among Nocturne's many victories were several won in Get of Sire competitions, in which the winner is determined based on the quality of his offspring. As the author of the 1977 article commented: As impressive as Nocturne's wins appear to be, proof of a stallion's values lies in his ability to pass these same winning qualities on to his get. Few stallions have paralleled Nocturne's genetic ability to do just that. One of Nocturne's most celebrated offspring was a stallion named Moonshot. This horse was sold by Waseeka as a colt for $2,500 but years later after petitioner's stable *244 was shut down, the horse was sold at public auction by its then owner for about $167,500. Nocturne's career as a sire ended, however, when he became sterile in 1972. Stud fees which had already been collected for breeding mares with Nocturne had to be returned when his sterility was discovered, and the chance of earning future stud fees for his services was lost. Had Nocturne been able to continue breeding normally, Waseeka would have earned an additional $10,000 to $15,000 annually in stud fees during the period in question. In petitioner's Federal income tax returns for the fiscal years 1958 through 1970 she reported the following amounts as farm loses: Farm Income
or (Loss)
Year
(Schedule F)
1958
$ (36,572.64)
1959
(42,752.52)
1960
(34,761.02)
1961
(52,222.85)
1962
(34,440.34)
1963
(36,784.61)
1964
(18,626.41)
1965
(33,727.00)
1966
(45,058.00)
1967
(not available)
1968
(54,756.00)
1969
(30,344.00)
1970
(24,500.00)
These farm losses included the results of both the orchard and the stable. The record does not reveal how much of the losses was allocable to each activity, but petitioner does not allege that her horse-breeding *245 operations would have shown a profit for any of those years if they had been reported separately. Petitioner's tax returns for fiscal 1964 and 1965 were audited by respondent, who initially challenged the deductibility of the losses of the horse farm. After an appellate conference, however, the losses were allowed, and the returns were accepted as filed. Petitioner gave up her orchard business after fiscal year 1970. For fiscal years 1971 through 1974, the Schedule F in her tax return reported only the results of the operations of her stable, which yielded gross income and net losses in the following amounts: Net
Gross
Farm Income or
Year
Farm Income
(Loss) (Sched. F)
1971
$19,017.36
[1] $ (105,488.56)
1972
8,027.00
( 45,105.76)
1973
14,134.50
( 36,241.92)
1974
17,982.00
( 38,489.44)
*246 The gross income was derived from the sales of horses and stud fees and boarding of mares awaiting service. Petitioner's tax returns for 1973 and 1974 were audited and the deductibility of her farm losses was challenged on the ground that the stable was not an activity engaged in for profit, within the meaning of section 183. As discussed below, petitioner elected under section 183(e) to postpone the resolution of the matter until the close of fiscal year 1977. Subsequent to the audit, the taxpayer's daughter, Susan Annis, prepared a memorandum concerning Waseeka Farm. In it, she analyzed Waseeka's expenses and set forth her "goals and expectations" for the stable in fiscal year 1975. She anticipated the expenses and income between October 1, 1974, and September 30, 1975, [2] to be "somewhat as follows": Estimated Income
$52,050
Estimated Expenses
$46,540
Estimated Profit
$ 5,510
Mrs. Annis noted, however, that the amount of estimated expenses - does not include any legal fees, bookkeeping chgs., postage, photographs, secretarial *247 costs, registration, or maintainance on such equipment as the tractor, horse trailer, etc. The true gross expenses may be considerably higher. She also stated that: Everyone will have to work very industriously in order to keep expenses under control and at the same time to get mares in foal and to keep them in good and safe accomodations [sic] so that their owners will consider the high stud fee and high board to be a worthwhile investment. We must get our own and visiting mares in foal consistently or will no longer attract any stud fees nor have the foals which it is essential we sell to support the expense of the stable. * * * If the stable expense is going to run at $46,000.00 or more per year (including commissions on sales, of course) then very careful attention will have to be paid to the income production during each following year to insure an adequate supply of income producing horses. How many foals will we have to raise? and how much will we have to get for each? will the market stand it? Can we? As long as there are any horses on the farm at all, there will be a certain unavoidable overhead associated with them. The challenge is to increase income *248 enough to show at least a small profit each year, even though to do so raises the total expense. It seems as though we stand at the beginning of our best opportunity, in a long time, to accomplish this goal because we have some very desireable [sic] horses which we can offer for sale immediately without reducing our production potential by so doing. But I repeat again and again, that our own production must remain high enough to carry the stable. For the fiscal years 1975 through 1977, petitioner reported the following amounts of farm income: Farm Income
Gross
or (Loss)
Year
Farm Income
(Schedule F)
1975
$42,411.86
$3,054.26
1976
31,826.93
257.18
1977
8,668.00
1,562.39
Those reported profits, derived in the main from the sale of petitioner's Morgan horses, were computed according to different accounting methods from the ones that had therefore been used. The income from the horse farm had previously been computed on the accrual basis, with inventories used to determine the cost of the horses sold. For the years 1975 - 1977, however, income was computed on the cash method without the use of inventories. The full amount realized *249 from the sale of horses was reported as income, but no offsetting deduction was claimed for the cost of the horses sold. Also the returns for those years show taxes of $2,899.32 in fiscal 1975, $2,153.62 in fiscal 1976, and $0 in fiscal 1977. If petitioner's prior accounting practices had been consistently employed throughout the fiscal years 1975 - 1977, each of those years would have shown a loss on the operation of Waseeka Farm. [3]
Petitioner's main source of income was a trust set up for her by her parents. During the years 1958 - 1977 her income from the trust and other investments averaged over $60,000 annually. During the same period, petitioner also realized net capital gains in excess of $400,000. Included in that total are gains realized in fiscal 1973 and 1974 on *250 the sale of some of her farm land. Land having a basis of $7,811.70 was sold in fiscal 1973 for $75,000, yielding a capital gain of $67,188.30. In fiscal 1974, tracts of land having a total basis of $8,104.24 were sold for $159,800.00, yielding a total capital gain of $151,695.76. OPINION 1. Section 183(d) Presumption Issue
Section 183(a) provides generally that, except as otherwise provided for in that section, individual taxpayers will not be allowed deductions which are attributable to activities that are "not engaged in for profit." Section 183(d) provides that, if the gross income generated by an activity exceeds the deductions attributable thereto for 2 or more of the 5 consecutive taxable years in question, the activity shall be presumed to be engaged in for profit "unless the Secretary establishes to the contrary." In the case of an activity "which consists in major part of the breeding, training, showing, or racing of horses," the 5-year period is extended to 7 years. Section 183(e) provides that the taxpayer may elect to have the determination as to the applicability *251 of section 183(d) presumption postponed until the close of the fourth taxable year following the year in which the taxpayer first engages in the activity, or the sixth taxable year in the case of an activity involving horses. In other words, a taxpayer who has not been engaged in the activity for the full 5 or 7 years may elect to postpone the determination of the presumption's applicability until the entire 5 or 7-year period has run. The election provision was enacted in 1971 [4] and was made effective for taxable years beginning after December 31, 1969. The statute provides that, for purposes of the election, "a taxpayer shall be treated as not having engaged in any activity during any taxable year beginning before January 1, 1970." Section 183(e)(1). This provision made it possible for petitioner to elect to postpone the section 183(d) determination at the time her tax returns for fiscal 1973 and 1974 were examined, even though she had, in fact, been breeding horses for about 20 years at that time. Petitioner argues that the presumption of section 183(d) applies in this case because, when the capital gains from *252 the sales of land in fiscal 1973 and 1974 are combined with the losses generated by the farm's operations during those years, the overall result is a profit in each year. Therefore, petitioner argues, Waseeka showed a profit in 2 years of the relevant 7-year period, triggering the presumption that it was an activity engaged in for profit. We do not agree with petitioner. The regulations clearly contemplate that capital gains, as well as income from operations, will be taken into account in determining whether the gross income from an activity exceeds the deductions attributable thereto. [5] The capital gain must, however, arise out of the activity under examination. The land that was sold had been in the family for some 50 years; it was not land acquired for the horse farm. Its sale involved merely the liquidation of the family estate. The regulations, moreover, provide that the holding of land for appreciation [6] and the farming of the land will be considered a single activity "only if the farming activity reduces the net cost of carrying the land", or, in other words, "only if the income derived from farming exceeds the deductions attributable to the farming activity which *253 are not directly attributable to the holding of the land." Section 1.183-1(d)(1), Income Tax Regs. In the present case, the income of the horse farm never exceeded the related expenses. Accordingly, the operation of the horse farm and the holding of the land were separate activities, and the question whether the horse farm was an activity engaged in for profit must be resolved on that basis rather than by considering the two activities together. [7] Accordingly, we reject petitioner's contention that the presumption of section 183(d) is in effect. *254 2. The Profit Objective Issue
Petitioner's failure to qualify for the favorable presumption of section 183(d) does not, however, give rise to any inference that Waseeka Farm was not an activity engaged in for profit. Section 1.183-1(c)(1), Income Tax Regs. That question remains to be decided. Guidance as to the meaning of the phrase "engaged in for profit" is found in section 1.183-2(a), Income Tax Regs., which provides: The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. In determining whether such an objective exists, it may be sufficient that there is a small chance of making a large profit. Thus it may be found that an investor in a wildcat oil well who incurs very substantial *255 expenditures is in the venture for profit even though the expectation of a profit might be considered unreasonable. In determining whether an activity is engaged in for profit. greater weight is given to objective facts than to the taxpayer's mere statement of intent. The regulations suggest nine criteria which "should normally be taken into account" in determining whether an activity is engaged in for profit. [8] The ultimate resolution of the issue does not depend, however, on any particular factor or combination of factors, but on all the facts and circumstances of the case. Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Allen v. Commissioner,72 T.C. 28, 34 (1979). The facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the actual and honest objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. per order (D.C. Cir., Feb. 22, 1983). *256 Applying that standard to the facts of this case, we find that Waseeka was not an activity engaged in for profit within the meaning of section 183. The unbroken string of substantial losses stretching back over decades, even standing alone, is strong evidence that petitioner's objective in operating her stable during the years in question was not to earn a profit. We do not question that petitioner's original intention when Waseeka Farm was founded in 1953 was to earn a profit, at least from the combined operations of the orchard and the stable. But we do not believe that that continued to be her objective, with respect to her horses, throughout the history of the enterprise, as one loss year followed another, or that it was her objective during the years in question. We emphasize that we do not base this finding on our own judgment as to the probability of Waseeka earning a profit. The standard is not whether petitioner reasonably expected to make a profit, but whether profit was her objective. If petitioner did not expect to earn a profit, however, then she must have had some other objective in carrying on with the stable. Waseeka's uninterrupted losses are, therefore, relevant *257 insofar as they lead to the inference that petitioner did not expect to earn a profit and that profit was not, in fact, her objective in continuing to breed and show horses. Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. per order 647 F.2d 170 (9th Cir. Mar. 25, 1981); Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). While petitioner was not herself a businesswoman, she was well advised in financial matters by her attorney and her daughter, who were obviously aware of the money that was being lost on Waseeka. This concern is evident in the memorandum written by Mrs. Annis, quoted in our findings, to which petitioner points as evidence of her profit motive. As we view the facts, however, the memorandum was more an attempt to keep Waseeka's losses within acceptable bounds than to turn it into a profitable enterprise. Although Mrs. Annis calculated that a profit of about $5,000 would be earned in fiscal 1975 if all of her objectives relating to income and containment of expenses were fully realized, she acknowledged in the memorandum that the potential costs were "considerably *258 higher" than those used in her calculations and listed numerous expense items not included in her estimates. In other words, profit depended on optimum sales proceeds and cost containment, and was in real danger of being wiped out by higher than projected expenses. We are confident that Mrs. Annis, in her role as her mother's advisor, was aware that the chance of earning a relatively slim profit, when seen against the background of the farm's demonstrated potential for producing substantial losses, was highly unlikely. We conclude that her objective was not to turn the stable into a profitable operation, but to enable her mother to continue on a smaller scale her horse breeding operation, in which she took well justified pride, without the costs becoming overly burdensome. In this regard, Mrs. Annis's statement that, "the challenge is to increase income enough to show at least a small profit," must be read in light of the surrounding circumstances. The memorandum was written shortly after a tax audit, the second in 10 years, in which the profit motive behind Waseeka was questioned. This fact takes on added significance in view of the unexplained changes in accounting methods *259 which were used to enable Waseeka to report gains for the fiscal years 1975 through 1977, when losses would have resulted if the old accounting methods had been consistently employed. These attempts to employ inconsistent accounting practices to show a small profit do not reflect well on the credibility of petitioner and her advisors in claiming that profit was their objective. [9]
We also find that petitioner took considerable pleasure and satisfaction in the operation of Waseeka Farm and the ownership of her prize winning Morgan horses. In the late 1950's and 1960's her horses won blue ribbons and other prizes in shows at numerous locations throughout the eastern United States. The quality of her stallion, Nocturne, *260 as well as other Waseeka horses, was highly publicized. Although she did not participate in the labor connected with caring for the horses and did not ride the horses in shows, the record demonstrates that she took deep and well deserved pride in the success of her horses in the show ring, and in the breeding and training of champions that was carried on on her premises. Our conclusion in this regard finds support in the fact that petitioner's prior hobby was a closely related activity, the breeding and showing of dogs. [10]
*261 The fact that petitioner had regular and substantial income from her trust is another factor which supports our conclusion that Waseeka Farm was not an activity engaged in for profit. Petitioner's relative wealth is certainly not determinative of the issue, but it is relevant. A taxpayer with less outside income would be less able than petitioner to persist in an activity which, although enjoyable, was consistently losing money, and had no real prospects of ceasing to do so.Such person would probably be unwilling to continue unless he anticipated that the activity would ultimately become profitable. Petitioner, by contrast, was able to continue losing money breeding and showing horses without, so far as the record reveals, any lowering of her standard of living.The maintenance of her living standard while incurring the losses was made all the more practicable by the reduced tax liability which resulted from the deduction of her losses. Some of the factors suggested in the regulations tend to support petitioner's claim that Waseeka was an activity conducted for profit, but they are not significant enough, in our view, to offset the factors discussed above which weigh against *262 her. Thus, while meticulous records were maintained of the stable's finances, the same was true of petitioner's household expenses. It is also true that petitioner employed expert trainers, but their expertise lay in the producing of champions; the record does not demonstrate that they were comparably expert in the more mundane matters of maximizing revenues and controlling costs. Petitioner also points to the misfortune of Nocturne going sterile and its adverse effect on her chances of earning a profit. This occurred in 1972, however, at the beginning of the period in question, and petitioners must have taken the loss of Nocturne as a sire into account in assessing their chances for profit in the remaining years of the period in question. What is more, we cannot ignore the fact that the stable was never even nearly profitable even when Nocturne was in full health. The untimely death of petitioner's trainer, Priscilla Lydon O'Connor, in 1977 is another factor which, petitioner argues, explains her poor operating results. Mrs. O'Connor's death, however, was in the last year of the 4 years in question and occurred after petitioner's horses had been disposed of. Accordingly, *263 we do not find convincing petitioner's argument that Mrs. O'Connor's passing was a significant factor in Waseeka's losses. Petitioner also points to the sale of Moonshot, a horse which had once been owned by Waseeka, at public auction for about $167,500. Petitioner argues that, had she been the one who made that sale, "there would have been no question of operational profit." The sale at auction, however, was apparently made some 6 to 8 years after petitioner had sold the horse for $2,500, and after her stable had been shut down entirely. The record does not show any of the circumstances of the sale. Moreover, even if the entire $167,500 had been gain to petitioner, without regard to costs incurred for the horse's care in the interim, it is not clear whether the gain would have been sufficient to recoup the overall losses in the intervening years. [11]Bessenyey v. Commissioner,supra, at 274. Accordingly, when all of the factors are weighed, we conclude that Waseeka Farm was not an activity engaged in for profit within the meaning of section 183(a). To reflect the *264 foregoing, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
1. This abnormally large loss appears from an examination of the fiscal year 1971 return to be attributable, in part, to the demolition of a storage building with a remaining cost basis of $36,464.01 and a demolition cost of $8,583.39. Also on Schedule F of the return relating to the Waseeka Farm for that year, real property taxes of $14,658.13 were deducted whereas only $1,169.90, $1,067.99 and $343.00 were deducted for fiscal years 1972, 1973, and 1974, respectively. No explanation is given for this discrepency as to the amount of taxes treated as business expenses.↩
2. This period did not coincide exactly with petitioner's taxable year, which, as noted above, ended June 30.↩
3. Using petitioner's prior accounting methods, and including expenses which he determined that petitioner had incorrectly omitted, respondent computed losses resulting from the operations of Waseeka as follows: Fiscal Year
Loss
1975
($24,440.44)
1976
( 21,742.82)
1977
( 4,033.11)
Petitioner has not challenged the correctness of respondent's computations in this regard.↩
4. Act of Dec. 10, 1971, Pub. L. 92-178, 85 Stat. 497, 525.↩
5. Sec. 1.183-1(c)(1), Income Tax Regs.↩, provides, in fact, that, for this purpose, the deduction for capital gains permitted by sec. 1202 is to be disregarded. Therefore, the full amount of the gain is included in the determination. 6. As to the holding of the land for appreciation in value, petitioner asserts on brief: Part of taxpayer's plans, as demonstrated by the evidence, was that assets used in her horse breeding, such as land, would appreciate in value. This, in fact, occurred. The farm land did greatly appreciate in value, and when certain protions of it were no longer necessary to carry on the horse breeding she sold it and realized and paid taxes on the appreciation.↩
7. Compare Golanty v. Commissioner,72 T.C. 411, 429-430 (1979), affd. per order 647 F.2d 170↩ (9th Cir., Mar. 25, 1981).
8. Those criteria are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs.↩
9. When Mr. Tiffin, who prepared petitioner's returns for the years in issue, was asked at trial if he could explain the deviations from prior accounting practice, her replied: "Nope." Significantly also, in fiscal 1975, petitioner sold six horses for $27,500 and, in fiscal year 1976, she sold four horses for $23,600. To treat these sales as income from a business begs the question; property used in a hobby as well as property in a business may be liquidated.↩
10. We do not suggest that no activity which a taxayer enjoys can be one entered into for profit. The remarks of the Court in another case involving another breeder of horses are apposite: We think that she gave little or no thought to whether her horse enterprise would ever be profitable, or whether the large losses that were being sustained annually would ever be recouped. Of course, we may well assume that she would have been pleased to make a profit, but, as we view this record, giving such weight to the testimony as its credibility warrants, petitioner was not engaging in an enterprise for profit. Her rewards consisted of personal satisfaction in the activity. To be sure, enjoyment of one's work is not inconsistent with a profit motive, but we cannot conscientiously find such motive in this case. Bessenyey v. Commissioner,45 T.C. 261, 275 (1965), affd. 379 F.2d 252↩ (2d. Cir. 1967).
11. The losses during the 4 years in question, for example, averaged over $30,000.↩