FRED W. AMEND CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No 5385–67. Filed November 19, 1970.

*John Enrietto*, for the petitioner.
*Robert H. Burgess*, for the respondent.

IRWIN, *Judge:* Respondent determined deficiencies in petitioner's income tax for fiscal years 1964 and 1965 in the amounts of $2,768 and $2,998, respectively. The only question presented is whether amounts

paid to a Christian Science practitioner and taken as business expenses for "professional services" on petitioner's income tax returns are deductible under section 162 of the Code.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

The Fred W. Amend Co. (hereinafter referred to as petitioner or Amend) is a corporation, having been organized under the laws of the State of Illinois on January 12, 1921. Its principal office and factory were located in Danville, Ill., at the time the petition herein was filed. Its administrative and sales offices were, however, located in Evanston, Ill.

For the fiscal years ending October 31, 1964, and October 31, 1965, petitioner filed its U.S. corporation income tax returns with the district director of internal revenue, Springfield, Ill.

Petitioner is a manufacturer and distributor of jellied candies which it sells in various sized packages under the trade name of "Chuckles." During the years in issue, petitioner employed approximately 173 hourly paid employees at its plant in Danville. Additionally, during fiscal year 1964 and 1965, 41 and 44 persons, respectively, were hired on a salary basis. Through Continental Insurance Co., petitioner provided full-scale hospital and health benefits for all of these employees.

Until 1956, Fred W. Amend (hereinafter Fred) presided over petitioner as president and treasurer. However, in that year his son-in-law, A. F. Rathbun, was made president. Fred remained as treasurer, and in 1959 also assumed the office of chairman of the board of directors—both of which offices he occupied at the time of the within proceeding. The following table reflects the ownership interest in petitioner held by Fred and his family during each of the years in issue:

Number of shares issued of all classes [2]

| | Preferred | Percent | Common | Percent |
|---|---|---|---|---|
| Fred W. Amend | 84 | 6. 80 | 13, 182 | 37. 63 |
| Mrs. Tulita H. Amend, wife | 96 | 7. 77 | 3, 453 | 9. 86 |
| Mrs. Dorothy Chamberlain, daughter | | | 2, 500 | 7. 14 |
| Mrs. Jane Nitschke, daughter | | | 2, 500 | 7. 14 |
| Mrs. Marjorie Rathbun, daughter | | | 2, 500 | 7. 14 |
| Fred A. Rathbun, son-in-law | 63 | 5. 10 | 727 | 2. 08 |
| Unrelated stockholders (74 at 10/31/64) (73 at 10/31/65) | 993 | 80. 33 | 10, 164 | 29. 01 |
| | 1, 236 | 100. 00 | 35, 026 | 100. 00 |

---

[1] All statutory references, unless otherwise indicated, are to the Internal Revenue Code of 1954, as amended.

[2] All voting stock.

As treasurer and board member, Fred played an active role in supervisory aspects of petitioner's business activities. Armed with daily report sheets and monthly financial statements, Fred was also able to keep abreast of all matters relating to cash flow, inventory status, and customer payments. Fred was also chairman of the corporation's executive committee. As such, he was responsible for convening meetings of the committee, during which time problems exposed by the daily report sheets were discussed by Fred and the other members of the committee.

Fred's annual salary, as well as the salaries paid to other Amend executives for the years indicated were as follows:

| | Fiscal years ended Oct. 31— | | | | |
|---|---|---|---|---|---|
| | 1961 | 1962 | 1963 | 1964 | 1965 |
| Fred W. Amend: Director, chairman of the board, treasurer, and member of the executive committee__ | $36,515 | $40,187 | $38,241 | $37,825 | $32,800 |
| A. F. Rathbun: Director, president, and member of the executive committee_____ | 35,107 | 40,557 | 47,103 | 47,412 | 40,544 |
| J. C. Miller: Director, executive vice president, and member of the executive committee_____ | 29,462 | 33,637 | 33,993 | 35,996 | 31,412 |
| Carl W. Werner: Controller and member of the executive committee_____ | ---------- | ---------- | ---------- | 13,904 | 13,230 |

R. M. Halverstadt (hereinafter Halverstadt) was, during the years in issue, a Christian Scientist practitioner and teacher. Halverstadt, a graduate of the University of Chicago where he had majored in economics, had become a full-time Christian Science practitioner around 1923, and had uninterruptedly practiced that calling, in the Chicago, Ill., area, up to the time of the trial herein. As a Christian Science practitioner, Halverstadt's services were made available to many members of the Chicago Christian Science community.

Halverstadt was first contacted by Fred in 1954. Thereafter, Fred, a non-Christian Scientist who, nevertheless, contributed 10 percent of his income to the Christian Science Church, regularly sought spiritual assistance from Halverstadt in matters pertinent to both his (Fred's) personal and business endeavors. Typically, their meetings and telephone consultations would begin with Fred defining a problem with which he was faced. Halverstadt would then ask a series of questions designed to give Fred a fuller appreciation of the requirements of the problem. With the insight provided by Halverstadt's counsel, Fred was often able to return to his business or private affairs, and approach problems with detachment and new understanding.

Halverstadt never offered concrete solutions to any of the matters he discussed. Instead, Halverstadt, after exploring a problem via the questioning process mentioned above, would devote his energies to invoking the presence of the Divine Mind.

By way of background, it is the belief of the Christian Science Church that God—the Divine Mind—is spiritually present in all things, and that the universality of His presence is felt by all men since they are the collective embodiment of His spiritual fullness. If, therefore, man—being the paradigm of this divine omnipresence—is to succeed in his temporal endeavors, he must strive to achieve an awareness consonant with the universal spirituality with which all men have been endowed. Accordingly, Halverstadt, as a Christian Science practitioner, sought to bring to his followers the spiritual awareness needed for success in their day-to-day activities. This he attempted to do by "prayerful consideration," in which he prayed to and sought guidance from the Divine Mind, and by "spiritual clarification"—the term used by Fred to describe the nature of the service provided to him by Halverstadt.

As indicated earlier, Fred consulted Halverstadt on a regular basis. During such consultations, Fred sought counsel on matters germane to both his personal and business life. For his assistance, Halverstadt charged Fred $3 for each consultation; and though such fees were initially paid by Fred, Amend reimbursed him for all payments attributable to consultations in which Amend's business matters were discussed. Such reimbursements were paid to Fred through the Evanston office. However, in 1961, Fred decided that, from an accounting standpoint, payments to Halverstadt for consultations which were business (Amend) oriented ought to be paid directly to Halverstadt through the corporation's accounting office in Danville. It was also decided that Halverstadt should be placed on retainer so that he would be available whenever a problem relating to the business arose. With these considerations in mind, the following resolution was adopted by the corporation on April 11, 1961:

WHEREAS, in the opinion of the members of this Board the services of a Christian Science Practitioner, as a consultant for employees with respect to matters which so disturb them as to handicap them in performing their services for the company, and also as a consultant of the officers as to the best approach to corporate problems, would be to the corporation's advantage and further the corporate enterprise.

RESOLVED, that Fred W. Amend, the Chairman of the Board of Directors of this corporation be authorized to arrange for the employment of a Christian Science Practitioner by the Company on such terms as he considers appropriate and in the best interests of this corporation.

As consideration for the retainer arrangement, Halverstadt was to be paid a monthly stipend of $400 a month—an amount unilaterally arrived at by Fred.

Although Halverstadt's services could have been utilized by various members of Amend's supervisory staff, Fred was the only Amend

employee to avail himself of such services. Indeed, lower-ranking Amend employees were not even advised of his availability. During the years in issue, Fred and Halverstadt considered a broad spectrum of problems relating to Amend's business. Among such problems considered were matters dealing with machine output, labor-management relations, and the type of packaging to be used in the production of Amend's candy products. Consultations which were of a personal nature were independently billed at the customary rate of $3 per session, and were paid for by Fred out of his personal funds.

For the years in issue, Fred, who was 73 years of age in 1964, enjoyed good health. During this period he spent his summers in Michigan and his winters in Florida. The duration of his visits to either of these places was not disclosed.

The retainer arrangement with Halverstadt continued uninterruptedly during the years subsequent to 1961, and as Fred's estimation of the value of his services to Amend increased, so did the terms of the retainer. For the 2 years in question, Amend paid Halverstadt amounts of $5,500 and $6,200, respectively. The deduction of these amounts as "professional services" on Amend's U.S. corporation income tax returns led to the deficiency assessment herein.

### OPINION

During the years in issue petitioner authorized the retention of a Christian Science practitioner purportedly to counsel its employees on matters germane to their well-being and the well-being of the petitioner's business. At the behest of Fred Amend, petitioner's treasurer and founder, the resolution authorizing the retention of a Christian Science practitioner was enacted in 1961, and empowered Fred to retain a person of his choosing. The man employed, R. M. Halverstadt, was an obvious choice in that Fred had utilized his services for many years.

Whether by design or happenstance, once retained, Halverstadt saw only Fred. The "spiritual clarifications" provided by such visits enabled Fred to tackle corporate problems with objectivity and resolve. The cost of the retainer was charged to an account called "professional services," and was taken as a deduction on the corporation's income tax returns for each of the years under review. The primary question presented is whether, under section 162, the amounts paid to Halverstadt constituted "ordinary and necessary" expenses of petitioner's business of manufacturing and distributing candy.

To characterize as vexatious the task of determining whether an expenditure is "ordinary and necessary" to a taxpayer's business is to define in mild terms a problem as convoluted as the scope of human

experience is wide. *Welch* v. *Helvering*, 290 U.S. 111 (1933) ; *General Bancshares Corp.* v. *Commissioner*, 326 F. 2d 712 (C.A. 8, 1964), affirming 39 T.C. 423 (1962). What may be an absolutely indispensable expenditure in the trade or business of taxpayer A may prove to be only incidentally related to the business of taxpayer B. Compare *J. Raymond Dyer*, 36 T.C. 456 (1961) (cost of instituting a libel suit deductible where primary purpose was to protect taxpayer's reputation as an entertainer) with *Lewis* v. *Commissioner*, 253 F. 2d 821 (C.A. 2, 1958), affirming 27 T.C. 158 (1956) (author's defense of wife's suit to declare him incompetent not proximately related to the business of being an author). Hence all that can be done is to review each case on its own facts in an effort to determine whether the expenditures involved comport with the mandate of the statute as illuminated by the decisional law.

In the case at bar, petitioner is a corporation. Nevertheless, the services which gave rise to the expenditures it incurred were primarily for the benefit of one of its key executives. Even so, it is argued that the derivative benefits gained by it as a result of these expenditures provided the essential nexus needed for deductibility under section 162(a). We disagree.

Although it is clear that some expenditures which are helpful to an executive in the fulfillment of his corporate duties are deductible, *Stephen Hexter*, 47 B.T.A. 483 (1942), it is also clear that where a corporation is merely the incidental beneficiary of corporate expenditures designed to further ends primarily personal to one of its executives, the deductibility of such expenditures will be disallowed. Compare *Pantages Theatre Co.* v. *Welch*, 71 F. 2d 68 (C.A. 9, 1934). Accordingly, the crucial question, as we see it, is whether within the realm of "commercial reality," *Canton Cotton Mills* v. *United States*, 94 F. Supp. 561 (Ct. Cl. 1951), the expenditures incurred were not only "sufficiently related to [petitioner's] business to qualify as true business expenses," *Robert J. Wallendal*, 31 T.C. 1249 (1959), but were also so nonpersonal in nature as to avoid the far-reaching proscription of section 262. *Paul Bakewell, Jr.*, 23 T.C. 803 (1955). In the instant proceeding, we believe this last-mentioned consideration is enough to preclude the deductions sought.

Over the years, much has been said in an effort to reconcile the business expense provisions of section 162 with the provisions of section 262 which prohibit the deduction of "personal, living or family" expenses, even if related to one's occupation. See *Henry C. Smith*, 40 B.T.A. 1038 (1939), affirmed per curiam 113 F. 2d 114 (C.A. 2, 1940) ; *Ralph D. Hubbart*, 4 T.C. 121 (1944) ; *M. D. Harrison*, 18 T.C. 540 (1952) ; *Paul Bakewell, Jr., supra;* and *Ronald D. Kroll*, 49 T.C. 557 (1968). However, the common thread which seems to bind the cases

together is the notion that some expenses are so inherently personal that they simply cannot qualify for section 162 treatment irrespective of the role played by such expenditures in the overall scheme of the taxpayers' trade or business. The following language from *Paul Bakewell, Jr.*, *supra*, in which the cost of maintaining a hearing aid was disallowed as a business deduction, poignantly brings this thought to the fore:

> We believe that a hearing aid is so personal as to come within the meaning of section 24(a)(1). Even if it is used in petitioner's business, in fact even if it is necessary for his successful law practice, the device is so personal as to preclude it from being a business expense. A businessman's suit, a saleslady's dress, the accountant's glasses are necessary for their business but the necessity does not overcome the personal nature of these items and make them a deductible business expense. The same must be said of the hearing aid. * * * [23 T.C. at 805³]

In the instant case, we believe the "spiritual clarification" provided to Fred by Halverstadt was so personal as to come within the injunction of section 262. Granted, the spiritual balance which Fred experienced after each consultation rendered him better able to cope with the day-to-day strain of supervising a large business. It is similarly acknowledged that those meetings with Halverstadt not paid for by personal check were probably devoted to a consideration of Fred's handling of business problems. However, the very function served by these meetings—that of imparting spiritual equanimity to the person seeking assistance so that he might pursue matters common to all men with a greater awareness and understanding—militates against their being treated as something particularly suited to the business, in this case, of manufacturing candy. At no time during his consultations with Fred did Halverstadt even offer an observation or solution to a given problem. Instead, his function was served by asking questions calculated to heighten Fred's level of awareness. With new awareness thus imbued, Fred, it was hoped, would then be able to call upon business skills already possessed, and tackle Amend's problems with a greater sense of clarity and understanding.

Hence, it can be seen that it was not Fred's skills as a businessman which Halverstadt sought to enhance. Rather, what was sought was a state of harmony in which Fred's business thinking would be brought into conformity with an ordered universe governed by the Christian Science Church's concept of the Divine Mind. As such, if our under-

---

³ SEC. 24. ITEMS NOT DEDUCTIBLE. [I.R.C. 1939]

(a) GENERAL RULE.—In computing net income no deduction shall in any case be allowed in respect of—

(1) Personal, living, or family expenses, except extraordinary medical expenses deductible under section 23(x).

standing of this very difficult question is correct, we see little difference between the services provided by Halverstadt and those regularly provided by the duly ordained representative of any other faith whose task it is to bring spiritual understanding to man in his temporal surroundings. In each case we believe the benefits derived from the services rendered by such men are inherently personal, and, therefore, not susceptible to treatment under section 162.

Having arrived at the conclusion stated above, we now turn to petitioner's alternate claim in which it is contended that if Halverstadt's services are found to have been conferred on Fred as a personal benefit, then the value of such service should be treated as additional salary deductible under section 162(a) (1).[4]

It is a well-established maxim that where a corporation assumes the cost of benefits which are personal to one of its shareholders, the value of such benefits may constitute a distribution taxable to the shareholder as a dividend and not deductible by the corporation. *Challenge Manufacturing Co.*, 37 T.C. 650, 663 (1962) ; *A. A. Emmerson*, 44 T.C. 86, 91 (1965) ; *Irving Sachs*, 32 T.C. 815, 820 (1959), affd. 277 F. 2d 879 (C.A. 8, 1960) ; and *John L. Ashby*, 50 T.C. 409, 417, (1968). Indeed, where the facts of a given case indicate that constructive dividend treatment is warranted, it matters not that there was no formal dividend declaration. *Clark* v. *Commissioner*, 266 F. 2d 698 (C.A. 9, 1959), affirming on this issue a Memorandum Opinion of this Court. Nor is there any requirement that the distribution be pro rata among the shareholders or that all shareholders participate in it. *Commis-*

---

[4] Petitioner, for the first time in its brief, also argues that the cost of Halverstadt's retention and, accordingly, the cost of the services performed by him qualify as medical expenditures within the meaning of Rev. Rul. 55–261, 1955–1 C.B. 307, Rev. Rul. 63–91, 1963–1 C.B. 54, and sec. 1.162–10(a), Income Tax Regs., and are, therefore, deductible under sec. 162. Apart from the fact that issues not raised by the pleadings, but argued for the first time on brief, should not be considered by this Court, *William Greenberg*, 25 T.C. 534 (1955), we believe this argument is, in any event, without foundation.

Fred's testimony indicates that during the years in issue he enjoyed very good health. Furthermore, Fred, though believing in the benefits of "spiritual clarification" was not a practicing Christian Scientist; and, it is, therefore, not altogether certain that Fred would have approached Halverstadt with respect to problems affecting his (Fred's) health. Moreover, while it is arguable that the services provided by Halverstadt could be characterized as psychotherapeutic in nature, see *Namrow* v. *Commissioner*, 288 F. 2d 648, 649 (C.A. 4, 1961), in which the term psychotherapy is defined, Halverstadt, in his testimony, specifically repudiated the existence of any such relationship. Accordingly, even if the services of a person such as Halverstadt might, under the appropriate circumstances, be regarded as "medical care," we do not believe that, in the context of this case, the services provided by him warrant such a conclusion. See *George B. Wendell*, 12 T.C. 161 (1949), cited in Rev. Rul. 63–91, *supra*, wherein it was said that the "issue [of whether medical care was administered] turns on the nature of the services rendered, not on the experiences or qualifications or title of the person employed." As such, it is unnecessary to consider whether the resolution of Apr. 11, 1961, can be regarded as a medical expense "plan" within the meaning of secs. 1.105–5(a) and 1.162–10(a), Income Tax Regs. (For cases dealing with this question see *Samuel Levine*, 50 T.C. 422 (1968), and *Alan B. Larkin*, 48 T.C. 29 (1967), affd. 394 F. 2d 494 (C.A. 1, 1968).)

*sioner* v. *Riss*, 374 F. 2d 161 (C.A. 8, 1967), affirming a Memorandum Opinion of this Court; and cases cited in *Irving Sachs, supra.* Accordingly, where, as here, it is held that benefits personal to petitioner's shareholder–employee were paid for by petitioner; the burden of proving that such benefits were intended as salary, and were not intended as distributions in the nature of a dividend, rests with the petitioner.[5] This, we believe, petitioner has failed to do.

In addition to the fact that petitioner has failed to establish any intent on its part to provide Fred with additional remuneration during the years in issue, cf. *Pantages Theatre Co.* v. *Welch, supra*, it has altogether failed to prove that the salary paid to Fred during such period, when coupled with the amounts paid to Halverstadt, would have represented reasonable compensation for Fred's services as treasurer and board chairman. This is particularly crucial in light of the fact that Fred, a man in his seventies who had some years earlier passed the reins of the corporation over to his son-in-law, appears to have spent a considerable amount of his time vacationing in Florida and Michigan.

Petitioner cites respondent's Rev. Rul. 57–130, 1957–1 C.B. 108,[6] as support for the position that the value of the services performed by Halverstadt should be treated as additional salary payments as opposed to a constructive dividend. However, we do not regard respondent's ruling as being of any benefit to petitioner since nowhere therein is there any indication that the corporate executive to whom additional salary was being attributed was also a shareholder of the corporation.

Basing our determination on the record as a whole, we conclude that the amounts in question were not intended as additional salary to Fred. Accordingly, such amounts are not deductible by petitioner under either of its theories.

*Decision will be entered for the respondent.*

---

[5] The record does not reveal the amount of earnings and profits which the corporation had available for the payment of dividends during each of the years in issue. However, the burden of proof with respect to this matter rests with the petitioner. *Irving Sachs*, 32 T.C. at 821.

[6] "Advice has been requested with respect to the tax treatment of amounts expended by an executive, or an employer on behalf of an executive, who avails himself of reconditioning and health-restoring services afforded by certain resort hotels and athletic clubs.

\*       \*       \*       \*       \*       \*       \*

"Where an employer pays the expenses of one of its executives incurred in connection with securing the benefits of the reconditioning program offered by a resort of the type mentioned above, such expenditures generally constitute additional compensation to the executive and he is required to include the amount thereof in gross income for Federal income tax purposes. Expenditures which are compensatory in nature are deductible by an employer under section 162 of the Code, provided the total amount expended, plus other compensation paid to the executive, is no more than reasonable compensation for personal services actually rendered by him."