THIS OPINION APPEARS AS AMENDED BY ORDER DATED JULY 19, 1999.

T.C. Memo. 1999-131

UNITED STATES TAX COURT

RALPH LOUIS VITALE, Jr., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 346-97.            Filed April 21, 1999.

Ralph Louis Vitale, Jr., pro se.

<u>William J. Gregg</u> and <u>Judith C. Cohen</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

FAY, <u>Judge</u>:  Respondent determined deficiencies in peti-
tioner's 1993 and 1994 Federal income taxes in the respective
amounts of $4,256 and $6,702, and accuracy-related penalties

under section 6662(a)[1] in the respective amounts of $851 and $1,751.

The issues for decision are: (1) Whether petitioner was in the trade or business of being an author during the years in issue; if so, (2) whether expenses that petitioner incurred are deductible as ordinary and necessary under section 162 and whether he has adequately substantiated under section 274(d) his travel expenses;[2] and (3) whether petitioner is liable for penalties for negligence or substantial understatement of tax under section 6662(a). In the notice of deficiency, respondent disallowed petitioner's medical expense deduction for 1994 because of the increase in the amount of adjusted gross income determined. The correctness of this adjustment depends upon our resolution of the issues stated above.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and second stipulation of facts, together with the exhibits attached thereto and exhibits offered

---

[1]All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[2]Although respondent did not raise the substantiation issue under sec. 274 in the notice of deficiency or in the pleadings, it was tried by both parties and without objection by petitioner. See Rule 41(b)(1).

at trial, are incorporated herein by this reference. Petitioner resided in Arlington, Virginia, when he filed his petition.

Petitioner holds a bachelor's degree in marketing and advertising from the University of Maryland. Towards completion of that degree, he earned more than 24 credit hours of study in English, journalism, and speech. Petitioner worked 40 hours per week for the U.S. Department of the Treasury (hereinafter Treasury) as a budget analyst until January 1997, when he retired after more than 35 years of service. He had been employed at a GS-12 pay grade. As part of his job, he was required to "write budget justifications, procedures, and other written material by applying professional level writing ability to create high quality written work."[3] In an office staffed mostly by

---

[3]This describes one of the six critical elements of petitioner's job as a budget analyst at the U.S. Department of the Treasury. In a report of petitioner's performance for the period Jan. 1 to Dec. 31, 1994, he was given a rating of "outstanding" in meeting this element. The level of performance required for an outstanding rating exceeds the requirements for an "excellent" rating. A rating of excellent was described in the report as follows:

Writes budget justifications, statistical reports, procedures, guidelines, and other written materials in a manner that is clear, concise and correct. Particular attention must be given to grammar, spelling, etc. The written product must be able to communicate ideas in an effective manner. Demonstrates a special talent for writing narratives. Ideas are concise and clear in their presentation, as indicated by few follow-up questions being asked by recipients. Grammar and spelling are excellent. Paragraphs and sentences are

(continued...)

accountants, petitioner was often the one delegated to perform writing-based tasks, such as contributing to the Federal Managers' Financial Integrity Act report, in which agencies evaluate their internal control and accounting systems. At some point during his employment, petitioner also served as editor of an in-house newsletter of the Treasury.

In 1992, approximately 2 years before petitioner became eligible to retire, he began writing outside of his full-time job. At trial, petitioner testified that he was "fearful of the concept of retirement" and began writing in 1992 with the hope of making it his second career. The first book-length manuscript he began writing was a fictional piece titled "Lightning at Dawn". Later that same year, petitioner wrote a collection of short stories called "Boys and Girls Together". Before marketing these manuscripts for publication, petitioner had an idea for another book——a story about the experiences of two men who travel cross-country to patronize a legal brothel in Nevada. In early 1993,

---

[3](...continued)
correctly structured. Works independently in drafting all material and seeks guidance only when goals have changed. The employee's success at this level is also measured in the ability of justifications to be well received and acted upon. No more than 1 revision is required for the finished product. [Emphasis added.]

By signing the report, petitioner acknowledged its contents, including the mark of outstanding that he received for his writing ability on the job.

petitioner wrote an 18,000-word draft of this basic story line, which he submitted for copyright protection in June.[4]  In order to authenticate the story and develop characters for the book, petitioner visited numerous legal brothels in Nevada by acting as a customer for prostitutes.

In a journal describing his experiences at the brothels, petitioner recorded the brothels he visited, the dates (and sometimes the hours) of his visits, the prostitutes he met, and the amount of cash he paid each one.  For each entry, petitioner wrote about his visit with the prostitute and about the happenings at brothels in general.  For example, he described the manner in which he selected her, the house rules of the brothel, the manner in which he negotiated a price for her time, their dialogue, and the type of clothing worn by her.  He also included personal information on the prostitute, including her age, physical characteristics, city or State of residence, religious background, ethnicity, level of education, and the name and age of her offspring, if any.  The journal indicates that, at some point during these meetings, petitioner told the prostitutes that he was writing a book about Nevada's legal brothels and that he wished to use them as characters in his book.  The journal shows that, during 1993, petitioner spent, on average, 3 days per month

---

[4]Petitioner's two previous works, "Lightning at Dawn" and "Boys and Girls Together", were also copyrighted in 1993.

(except during the months of February, May, and December) meeting with prostitutes at the brothels.

Using the material that he gathered during these meetings (hereinafter sometimes referred to as interviews), petitioner produced a manuscript called "Searchlight, Nevada" which he submitted for publication. On October 13, 1993, petitioner entered into an agreement for its publication with Northwest Publishing, Inc. (Northwest).[5] In pertinent part, the agreement provided that,

> (1) Petitioner was to pay Northwest $4,375 to publish 10,000 copies of his book;[6]

---

[5]Before submitting his manuscript to Northwest Publishing, Inc. (Northwest), petitioner consulted "Writer's Market '93" a publication describing various publishers. In it, Northwest is described as a book publisher that,

> Publishes hardcover, trade paperback and mass market originals and reprints. Publishes 40-50 titles/year. Receives 700-800 queries and 500 * * * [manuscripts]/ year. 85% of * * * [manuscripts] from first-time authors, 95% from unagented writers. Pays 10-15% royalty on retail price. Publishes book 4 months after acceptance of * * * [manuscript].

[6]In a letter to petitioner confirming receipt of this payment, Rick Devey, the marketing director of Northwest, described it as a "joint-venture payment". In another letter to petitioner, Jim Perkins, Northwest's operations officer, explained that "the payment you made of $4,375 (your share of the joint venture) represents approximately one fourth of the total cost of producing and marketing ten thousand copies of your book".

(2) of the 10,000 copies printed, Northwest would (a) give 100 free copies to petitioner; (b) give away 200 copies to major bookstores and book reviewers; (c) sell 2,500 copies through its "test market program"; and (d) sell the remaining books in the retail marketplace;

(3) petitioner would be paid 40% of the retail amount of each book sold through the test market program, and a royalty equal to 15% of the retail price of any remaining books sold to bookstores and wholesalers;

(4) Northwest was to pay royalties on January 31 and July 31 of each year, along with interest penalties for late payments;

(5) Northwest was to do a certain amount of sales promotion, advertising, and publicity; and

(6) Northwest was to have exclusive rights to the book. Representatives of Northwest had told petitioner that his book would probably earn him at least $20,000 in royalties.

"Searchlight, Nevada" was published by Northwest and released in December 1995 at a retail price of $7.95. The book is 131 pages long and has an international standard book number. It was available for immediate purchase at Barnes & Noble Book- sellers in Boynton Beach, Florida, and Falls Church, Virginia, and at Super Crown Books, store #106. The book could also be

purchased by special order at Borders Books and Music in Baileys Crossroads, Virginia.

Prior to the book's being released, petitioner played an active role in all stages of its publication. In 1994, after reviewing the first galley proofs, petitioner inquired about adding two additional chapters to the novel. Then by letter dated February 27, 1995, petitioner made detailed suggestions for the book's cover design and attached pictures of how he thought the characters on the cover should look. Petitioner closed the letter with the following words:

> Any additional assistance I can provide will be done gladly. I realize that the cover design is as important as the story on the inside. It doesn't matter if the story is good if we fail to motivate the reader into purchasing [sic] the book.

> \* \* \* \* \* \* \*

> Perhaps with our joint venture on "Searchlight, Nevada" we can add a hot seller to \* \* \* [Northwest's] catalog. I'd like us to sell over 100,000 copies.

Petitioner also actively participated in the promotion of his book.[7] He provided Northwest's public relations department with mailing lists and telephone numbers of bookstores, newspapers, magazines, and radio and motion picture companies. Petitioner, on his own, mailed about 60 complimentary copies of

---

[7]A marketing plan distributed by Northwest to its authors advises that "the more effort you are willing to put forth in promoting your book, the more successfully your book will sell."

his book, along with individualized letters, to bookstores, newspapers, magazines, and hotels. He worked with a marketing expert at Northwest to get his book stocked by distributors, and to set up book signings at major bookstores. When petitioner was unhappy with the contents of his press release, he rewrote it and sent his changes to Northwest. Moreover, when petitioner became dissatisfied with Northwest's marketing efforts, he wrote a letter demanding that the publishing company comply with the terms of its agreement.

By letter dated January 22, 1996, Northwest's account executive informed petitioner that 6,800 copies of his book had been ordered and shipped,[8] and that another 2,500 copies had been ordered by the Books By Millions chain. The letter also stated that Northwest's royalty statements would be mailed in approximately 3 weeks. On his 1996 Federal income tax return, petitioner reported $2,600 in gross royalties from his writing activity.

In late 1993, after petitioner had signed an agreement with Northwest to have "Searchlight, Nevada" published, he began research on another book, "Nevada Nights, San Joaquin Dawn". He wanted to document the difficulties that women face in their attempt to break free from a life of prostitution, because, as

---

[8]The letter failed to identify who placed the order(s) for these books or to whom they were shipped.

"the story's never been done before to any degree of authenticity", he thought it commercially viable.  After discovering that the rooms at the brothels were equipped with listening devices, he began meeting the women at other locations on "out calls," which he paid for by personal credit card.  In 1994, during the months of January, February, April, May, June, and July, petitioner spent anywhere from 1 to 6 days per month in Nevada on out calls with prostitutes.  He successfully encouraged 10 prostitutes to leave their profession.  As of the trial date, petitioner had not yet completed "Nevada Nights, San Joaquin Dawn".

Some time after a contract had been signed for the publication of "Searchlight, Nevada", petitioner submitted another manuscript to Northwest for consideration; i.e., "Lightning at Dawn", which was about 450 pages in length.  He was under the impression that Northwest required a joint venture payment for first novels only, and that, if Northwest agreed to publish "Lightning at Dawn", he would have to pay nothing.  Petitioner also attempted to market "Boys and Girls Together", but he ceased his efforts when he was told that there was no need or market for short stories at that time.

On May 1, 1996, 4 months after "Searchlight, Nevada" had been on the market, Northwest filed for bankruptcy protection.[9]

---

[9]Northwest filed for reorganization under ch. 11 of the U.S.
(continued...)

The corporation had been the subject of a continuing investigation by State authorities.  On November 8, 1996, petitioner filed a proof of claim with the U.S. Bankruptcy Court for the District of Utah in the amount of $17,854 for unpaid royalties and breach of contract.

After securing the return of his rights in "Searchlight, Nevada", petitioner began soliciting other publishing houses to have his book published a second time.  Petitioner received several responses, including a request by the president of Regnery Publishing, Inc., and an invitation by the editor-in-chief of Farrar, Straus & Giroux, Inc., to submit his manuscript for review.  He also began to send letters to literary agents soliciting their interest in his book.[10]  At the time of trial, petitioner had since rewritten parts of "Searchlight, Nevada" and had sent his revised manuscript to Paladin Press of Boulder, Colorado, at its request.  Petitioner also received a letter from

---

[9](...continued)
Bankruptcy Code.  The bankruptcy court had since converted the case to a ch. 7 liquidation.

[10]Literary agents act on behalf of authors to get publishers to buy the rights to their clients' works.  In exchange, agents usually collect a commission based on what the author earns from his work's eventual sales.

Petitioner did not engage a literary agent for the first publication of "Searchlight, Nevada".  Instead, he chose to study the book market and identify publishers which he thought might be interested in his work.  For the book's second publication, though, petitioner did attempt to have an agent represent him.

Neal Sperling, a Hollywood script agent, requesting that he submit a plot summary of his book for consideration as a made-for-television movie or feature film. Petitioner is presently a member of Washington Independent Writers, The Authors Guild, Poets and Writers, and Writers Market Book Club. During the years in issue, petitioner spent approximately 25-35 hours per week on his writing activity.

Apart from that activity, petitioner reported the following income on his Federal income tax returns:

|  | 1993 | 1994 |
|---|---|---|
| Wages | $53,076 | $54,243 |
| Dividend income | 6,111 | 4,847 |
| State/local tax refund | 174 | 999 |
| Capital gain (loss) | (3,000) | (3,000) |
| Total | 56,361 | 57,089 |

In 1993, petitioner began treating his writing activity as a trade or business. From that year on, he began filing a Schedule C (Profit or Loss From Business), in which he listed his principal business or profession as author. As of the date of trial, petitioner's writing activity had not resulted in a profit for any year, as reflected in the following table:

| Year | Net Loss |
|---|---|
| 1993 | $15,190 |
| 1994 | 23,517 |
| 1995 | 9,177 |
| 1996 | 8,183 |

For the years in issue, petitioner reported no income from his writing activity but claimed the following as deductible expenses on his Schedules C:[11]

|                          | 1993   | 1994    |
|--------------------------|--------|---------|
| Advertising              | --     | $100    |
| Commissions and fees     | $40    | 80      |
| Office expense           | 420    | 600     |
| Supplies                 | 150    | --      |
| Travel                   | 4,230  | 9,195   |
| Meals and entertainment  | 2,520  | 786     |
| Utilities                | --     | 657     |
| Other expenses           | 7,830  | 12,099  |
| Total                    | 15,190 | 23,517  |

For 1993, the item denominated "other expenses" consists of a $4,350 joint venture payment to Northwest and $3,480 in cash payments to prostitutes.  For 1994, other expenses consist of the following:  $2,349 for the purchase of a computer, supplies, and furniture; $480 for mailing expenses; $313 for membership dues; $5,660 for credit card expenses on out calls; $1,295 for tuition and books; $500 for sponsoring a race car team; and $1,502 for miscellaneous other expenses.

Petitioner's travel and meal deductions include expenditures for airfares, rental car expenses, food, and lodging in

---

[11]Petitioner filed two amended returns (Forms 1040X) for tax year 1994, one on June 15, 1995, and the other on July 7, 1995. Each amended return had a new Schedule C attached, in which petitioner adjusted the amount of expenses that he claimed in connection with his profession as an author.  The figures for 1994 represented in the table reflect the Schedule C expenses on the amended return filed July 7, 1995.

connection with his travels to Nevada.  For the years in issue, the record contains documentary evidence of petitioner's travel and meal expenses; i.e., airline tickets and travel schedules, and hotel, restaurant, rental car, and credit card receipts.

With respect to petitioner's interviews, he characterized the amounts he paid to the prostitutes as business related depending upon whether information gleaned from the interviews was used in his books.  Petitioner has personal credit card receipts for 1994 supporting the expenditures he incurred to interview prostitutes away from the brothels.  Petitioner does not have receipts of his cash expenditures in 1993 for the interviews that took place at the brothels.  Nor does petitioner have records supporting his deductions for advertising, commissions and fees, office expenses, supplies, utilities, or those expenses comprising "other expenses" for 1994 (with the exception of the interviews).

Around the time of the parties' preparation of a stipulation of facts, petitioner prepared a five-page reconstruction of his expenditures, using information reflected on airline tickets and itineraries, hotel and rental car bills, credit card receipts, and petitioner's own memory.  This included summary statements for 1993 and 1994, a flight log, and a log of his interviews.

In the notice of deficiency, respondent disallowed under sections 162 and 183 all of the expenses claimed on petitioner's

Schedules C for the years in issue because "it has not been shown that * * * [petitioner] either started a trade or business or entered into an activity for profit. * * * [Nor has he] established that any amount was for an ordinary and necessary business expense".

OPINION

Section 162(a) generally allows a deduction for all ordinary and necessary business expenses paid or incurred during the taxable year in carrying on any trade or business. To be engaged in a trade or business within the meaning of section 162, "the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).

We are satisfied that petitioner's writing activity was conducted with continuity and regularity during the years in issue. Nevertheless, in order for an activity to be considered a trade or business within the meaning of section 162, a taxpayer must conduct the activity with the requisite profit motive or intent. See id.

Petitioner argues that he engaged in his writing activity with the intent to make a profit and that his Schedule C expenses for tax years 1993 and 1994 were ordinary and necessary to his endeavor as an author. Respondent does not dispute that amounts

were in fact expended, but rather contests their deductibility. Respondent maintains petitioner was not engaged in the trade or business of being an author, and, accordingly, expenses incurred for the writing (and publication of one) of his books are not business expenses deductible under section 162(a). Rather, he argues, they are deductible only to the extent of the income derived from the activity under section 183.[12] Alternatively, if the activity is found to have been entered into for profit, respondent asserts that the claimed expenses were not properly deductible as ordinary and necessary under section 162 and that certain expenses were not adequately substantiated under section 274(d). At trial, respondent conceded that, with respect to section 274(d), the only element of substantiation lacking in this case is business purpose.

Petitioner bears the burden of proving by a preponderance of the evidence that he was engaged in writing for profit. Rule 142(a). The test of whether a taxpayer engaged in an activity for profit is whether he entered into, or continued, the activity with an actual and honest objective of making a profit. See Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without

---

[12]Sec. 183 was enacted to codify the distinction between a business and a hobby and to prohibit a taxpayer from obtaining a loss from an activity considered to be a hobby which was then used to offset other income. See S. Rept. 91-552, at 104 (1969), 1969-3 C.B. 423, 490.

opinion 702 F.2d 1205 (D.C. Cir. 1983). Although the taxpayer's expectation of profit need not be reasonable, it must be bona fide, as determined from all the surrounding facts and circumstances. See Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Dreicer v. Commissioner, supra at 645. Thus, whether the requisite profit motive exists is a factual question that must be determined upon the record, see Benz v. Commissioner, 63 T.C. 375, 382 (1974), with more weight given to objective facts than to petitioner's statement of intent. See Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(a), Income Tax Regs.

The Treasury regulations list nine factors as an aid in making the profit objective determination. They include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits that are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No one factor is conclusive, and we do not reach our decision herein by merely counting

the factors that support each party's position. See sec. 1.183-2(b), Income Tax Regs. Moreover, certain factors are given more weight than others because they are more meaningfully applied to the facts in this case. Respondent concedes that the fourth element, the expectation that assets used in the activity may appreciate in value, is inapplicable to the present case.

Taking into account the above factors and considering the record as a whole, we conclude that, during the years in issue, petitioner had a bona fide intention to derive a profit from his writing activity. In addition to petitioner's testimony, which we found to be credible and forthright, the evidence in the record shows an intent and effort by petitioner to engage in and continue in the writing field with the purpose of producing income and a livelihood.

We first look to the manner in which petitioner carried on the activity. Petitioner managed some aspects of this activity in a businesslike fashion. He kept bills, receipts, and schedules for his traveling expenses, and he kept a contemporaneous journal to substantiate cash expenditures that he incurred to interview prostitutes at the brothels, for which receipts were not available. Petitioner was able to use his records, including credit card statements, to compile logs for 1993 and 1994, showing his travel dates, the dates, times, and places of his interviews, the names of the prostitutes he interviewed, the per

hour charges he negotiated, and his method of payment. While petitioner may not have kept a separate checking account or a well-organized set of books, he did attempt to keep an accurate account of the expenses he incurred to research his books.[13] The record also indicates that, after signing a contract for the publication of "Searchlight, Nevada", petitioner made concerted efforts to promote his book. He took steps to gain maximum personal benefit from Northwest by working closely with its public relations department to ensure that his book was widely advertised and readily available in bookstores. Petitioner then supplemented Northwest's efforts by adopting various methods of his own, while, at the same time, remaining active as an author by writing other manuscripts. Furthermore, when Northwest filed for bankruptcy protection, petitioner did not abandon his writing activity; rather, he sought the return of his rights in "Searchlight, Nevada", and began an extensive search for a new publisher. He had rewritten and revised his manuscript, in an effort to make it more salable to the public, and thus, more attractive to prospective publishers. As an alternative marketing technique, petitioner also made attempts to engage a literary agent. In sum, although petitioner could have been more

---

[13]A comparison of petitioner's journal entries to the contents of "Searchlight, Nevada" reveals that, indeed, the book is based almost entirely on real people and events.

organized in keeping track of his expenditures, his efforts to make a financial success of his writing activity show a profit objective.

The fact that petitioner did not seek expert advice on how to start or maintain a business as a fiction writer does weigh against his argument that he carried on the activity in a businesslike manner. While petitioner had writing skills, it appears that they were mainly in the technical field of budget analysis. However, it is important to consider that petitioner used his writing skills extensively in his job at Treasury, where he worked for more than 30 years. Moreover, by virtue of his job assignments and performance rating, petitioner was led to believe that writing was his strong point. Although his success at Treasury is not a reasonable predictor of his success as a fiction writer, his prior writing experience is not unrelated to his anticipated performance as a writer in another field. We also note that petitioner has a bachelor's degree in marketing and advertising, which suggests that he has more than a basic familiarity with the business side of his writing activity. It is apparent from the record that petitioner took great interest in the commercial aspects of his endeavor.

The third factor in the regulations focuses on the time and effort expended by the taxpayer in carrying on the activity. There is little question that, during the years at issue,

petitioner spent numerous hours per week on his writing activity; i.e., doing research, writing manuscripts, soliciting publishers, and conferring in the early stages of publication. Respondent emphasizes that petitioner worked 40 hours per week as a budget analyst and suggests that his writing activity could not rise to the level of a trade or business because he also had a full-time job. We disagree with respondent. Petitioner's employment at Treasury does not preclude the possibility that his writing activity constituted a separate trade or business. We have recognized that a taxpayer may engage in more than one trade or business at any one time. See Gestrich v. Commissioner, 74 T.C. 525, 529 (1980), affd. without published opinion 681 F.2d 805 (3d Cir. 1982); Sherman v. Commissioner, 16 T.C. 332, 337 (1951). It is also well settled that the term "trade or business" includes the arts. Snyder v. United States, 674 F.2d 1359, 1363 (10th Cir. 1982). Furthermore, as we stated in Dickson v. Commissioner, T.C. Memo. 1986-182, "[Taxpayer's] maintaining a full-time job * * * in addition to his profit-seeking activities is a positive factor reflecting his motivation, rather than respondent's attempt at negative inference from the fact that petitioner devoted time to other activities."

The fifth factor, the success of the taxpayer in carrying on other similar or dissimilar activities, does not influence our analysis because petitioner has not previously engaged in a

writing activity.  We accept petitioner's testimony at trial that he was best known at Treasury for his writing ability and that he was often called upon to perform writing-based tasks.  This may have contributed to petitioner's belief that he could make money as an author.  Moreover, we are convinced that petitioner viewed his agreement with Northwest as offering a real potential for generating profit.

The next two factors, the taxpayer's history of income or losses with respect to the activity and the amount of occasional profits, if any, which are earned, are examined in tandem.  Respondent argues that petitioner's continuous record of losses from his activity is persuasive evidence that he was not engaged in this activity for profit.  Petitioner argues that, while his efforts as an author have not proved profitable up to this time, his hard work will be rewarded with substantial income when his search for a new publisher proves successful.

It is undisputed that petitioner did report a loss in each year of operation.  However, there are two important facts in this case which should be considered with respect to these losses.

First, section 1.183-2(b)(6), Income Tax Regs., states that losses incurred during the startup phase of a business are not necessarily indicative of a lack of profit motive.  Because petitioner did not begin treating his writing activity as a trade

or business until 1993, the tax years in issue mark the initial stages of his activity.  A significant amount of petitioner's total deductions for 1993 and 1994 were travel expenses, which he incurred to collect material for his books.  Now that such material has been amassed and incorporated in the manuscripts, petitioner, as a published author, expects his writing activity to be profitable.  To remedy the unforeseeable circumstance of his publisher's going bankrupt, petitioner has demonstrated that he has ideas and plans for future publications which would enable him to recoup not only his expenses, but also to make a profit.  See Golanty v. Commissioner, 72 T.C. 411, 427 (1979) ("The goal must be to realize a profit on the entire operation, which presupposes * * * sufficient net earnings to recoup the losses" (quoting Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967))), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

Second, these losses should be viewed in the context of the nature of petitioner's activity.  Works of fiction are difficult to write and to market.  We are persuaded by petitioner's statement that first-time authors are not normally offered cash advances.[14]  It is not surprising then, that, for the first 2 years of his writing activity, petitioner sustained losses.  This

---

[14]Advances are payments to an author before publication.

field appears to pay large amounts of money to those who succeed in it and "an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated." Sec. 1.183-2(b)(7), Income Tax Regs. Likewise, we are not inclined to give much weight to the seventh factor, the amount of occasional profits, if any, that are earned, because only the first 2 years of petitioner's writing activity are in issue.

Respondent argues that the next factor, the financial status of the taxpayer, negates petitioner's profit motive because his independent sources of income are such that the writing activity generated tax benefits for him. We disagree with respondent. We do not believe that petitioner's income was so high as to make tax savings his primary objective. We also do not find it unlikely that petitioner, aware of his upcoming retirement and of the change in his pre and postretirement income, would choose to embark on something new. No doubt the fact that he began his writing activity during his preretirement years contributed to his ability to try his hand at it. Nothing in the record, however, indicates that writing then became a hobby for him. Rather, we find it clear from his testimony and from the objective evidence that petitioner was a writer who desired success and who intended to make a profit from his work.

The last factor looks to elements of personal pleasure or recreation. It is obvious that petitioner enjoyed writing and derived personal satisfaction in helping prostitutes seek a new way of life. Nevertheless, "the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors". Sec. 1.183-2(b)(9), Income Tax Regs.

Petitioner has succeeded in proving that he engaged in his writing activity with a profit objective. There are admittedly some factors in this case which indicate the absence of a profit motive: Petitioner has a history of losses, he did not seek any expert advice, and, arguably, there is a recreational element in his writing. These factors, however, are outweighed by the facts demonstrating that petitioner did engage in writing for profit. And though his writing venture may have been speculative and his expectation of profit unreasonable, that alone does not preclude us from finding that petitioner was in the trade or business of being an author during the years before us.

Respondent next asserts that, for 1993 and 1994, petitioner's claimed expenses were not ordinary and necessary

business expenses.[15] Section 162(a) allows a deduction for all ordinary and necessary expenses incurred in carrying on a trade or business. Whether an expense is deductible under section 162 is ultimately a question of fact. See Commissioner v. Heininger, 320 U.S. 467, 475 (1943). An ordinary and necessary expense is one which is appropriate or helpful to the taxpayer's business and which results from an activity which is a common and accepted practice. See Boser v. Commissioner, 77 T.C. 1124, 1132 (1981), affd. by order (9th Cir. 1983). No deduction, however, is allowed for personal, living, or family expenses, even if related to one's occupation. See sec. 262; Fred W. Amend Co. v. Commissioner, 55 T.C. 320, 325 (1970), affd. 454 F.2d 399 (7th Cir. 1971).

Deductions are strictly a matter of legislative grace, and petitioner bears the burden of providing supporting evidence to substantiate the claimed deductions. See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). A taxpayer must keep sufficient records to establish their amount. See sec. 6001. Except in the case of expenses subject to section 274, if the taxpayer's records are inadequate or there are no records, the Tax Court may still allow a deduction based on a reasonable estimate, see Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d

---

[15]Respondent makes no claim that these amounts, if otherwise allowable, must be capitalized rather than deducted currently.

Cir. 1930), provided the taxpayer establishes that he is entitled to some deduction, see <u>Williams v. United States</u>, 245 F.2d 559, 560 (5th Cir. 1957); <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 743 (1985). In making an estimate, the Court may bear heavily against the taxpayer "whose inexactitude is of his own making". <u>Cohan v. Commissioner</u>, <u>supra</u> at 544.

On his Schedules C for the years in issue, petitioner claimed deductions for advertising, commissions and fees, office expense, supplies, and utilities. Petitioner presented no proof, such as bills, receipts, or canceled checks, or offered any testimony to establish that he incurred these expenses. The record does show, however, that, during 1993 and 1994, petitioner completed one manuscript and submitted it for publication. The Court is satisfied that petitioner incurred office expenses in this respect.[16] Applying <u>Cohan v. Commissioner</u>, <u>supra</u>, and "bearing heavily" against petitioner, we allow an office expense deduction of $400 for each of the years in question. Petitioner is not entitled to deductions for advertising, commissions and fees, supplies, and utilities for 1993 and 1994.

Petitioner claimed "other expenses" not included above in the amounts of $7,830 and $12,099, respectively, for 1993 and

---

[16]Sec. 280A limits the deductibility of expenses of a home office; respondent, however, did not raise the applicability of that section. We, therefore, do not consider it.

1994.  The amount for 1993 consists of a joint venture payment to Northwest and cash payments to prostitutes at Nevada's legal brothels.  Petitioner produced a canceled check reflecting his payment to Northwest and a contemporaneous journal supporting his deductions for amounts paid to prostitutes to research his book.  The amount for 1994 consists of a variety of expenses, for which petitioner has provided no documentary or testimonial evidence, with the exception of his expenses to interview prostitutes on out calls, which he substantiated by personal credit card receipts.

We allow petitioner to deduct the joint venture payment of $4,350 for 1993.  However, no deduction is allowed for the interview expenses.  We find that the expenditures incurred by petitioner to visit prostitutes are so personal in nature as to preclude their deductibility.  In evaluating whether certain expenses are personal or qualify as business expenses under section 162, the Court has found that some expenses are so "inherently personal" that they almost invariably are held to come within the ambit of section 262.[17]  Fred W. Amend Co. v. Commissioner, supra.  All the other items constituting "other expenses" for 1993 and 1994 are disallowed for lack of sub-stantiation.

---

[17]Sec. 262 provides that "no deduction shall be allowed for personal, living, or family expenses."

Respondent next asks us to find that petitioner has not adequately substantiated under section 274(d) his travel expenses. Section 274(d) overrides the Cohan doctrine with respect to expenses of travel away from home (including meals and lodging). See Sanford v. Commissioner, 50 T.C. 823, 827-828 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). A taxpayer must substantiate the amount, time, place, and business purpose of the expenditures, using adequate records or sufficient evidence corroborating his own statement. See sec. 1.274-5T(c)(1), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985).

Respondent conceded at trial that petitioner substantiated the amount, time, and place, but not the business purpose, of his travel expenses. In view of our holding that petitioner's interview expenses are nondeductible personal expenses, we find that his trips to Nevada served a dual purpose. This dual purpose warrants an allocation of travel expenses between business and nonbusiness use. While the evidence in this case does not permit an exact allocation, there is a basis for some allowance-if necessary, by drawing upon petiitoner's own method of allocating his interview expenses. Petitioner characterized the money he paid to prostitutes as business related if he incorporated the material from the interviews in his book. According to

petitioner's figures, approximately three fifths of the total amount that he paid for interviews was deducted as business expenses. Although the Court disallows any part of these interview expenses, we find that petitioner's allocation might well apply in determining the portion of his travel expenses attributable to business. Accordingly, for 1993 and 1994, we allow petitioner to deduct three fifth of his claimed travel expenses (including meals and lodging) under section 274(d). We sustain respondent's disallowance of the claimed deductions to the extent of two fifths thereof.

Finally, under section 6662, respondent determined that petitioner was liable for a negligence penalty for 1993 and a substantial understatement of income tax penalty for 1994. As relevant herein, section 6662(a) imposes an accuracy-related penalty equal to 20 percent of any underpayment that is attributable to negligence or a substantial understatement of income tax. An underpayment for purposes of this section is essentially the same as a deficiency. Compare sec. 6664(a) with sec. 6211(a). Although the instant case presents many issues, the only one giving rise to respondent's determination of penalties under section 6662 relates to whether petitioner properly deducted expenses that he incurred while writing books.

Negligence under section 6662 is the lack of due care or failure to do what a reasonable and ordinarily prudent person

would do under the circumstances.  See <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985).  It includes the failure to make a reasonable attempt to comply with the Internal Revenue Code.  See sec. 6662(c).  In claiming deductions for expenses related to his writing activity, petitioner has failed to establish his entitlement to certain expenses.  On the basis of the record, though, we are satisfied that petitioner's underpayment for 1993 was not due to negligence but, rather, solely to an honest misunderstanding of the law.  Petitioner has demonstrated that he made a reasonable attempt to comply with the internal revenue laws.  He had sought the advice of Internal Revenue Service representatives and of professional tax preparers on how to deduct expenses incurred as an author.  Petitioner was a credible witness, and it is our opinion that he acted reasonably and in good faith.  For these reasons, we decline to impose the negligence penalty for 1993.

For 1994, the deficiency notice determined an accuracy-related penalty against petitioner for the substantial understatement of income tax.  Respondent did not pursue the matter at the trial or on brief, and we presume that respondent has abandoned it.  Accordingly, we hold for petitioner on this issue.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.
