# United States Tax Court

T.C. Memo. 2025-35

MARK P. HIMMEL AND DEBORAH W. HIMMEL,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 30412-12.                           Filed April 17, 2025.

————

*Robert C. Barrett, Jr.*, for petitioners.

*Andrew J. Lorenz* and *Ardney J. Boland*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

ASHFORD, *Judge*: Beginning in 1981, petitioners engaged in breeding, boarding, showing, and training Arabian horses. They continued to engage in the activity at least up until trial despite reporting losses dating back to at least 1993. The Internal Revenue Service (IRS or respondent) audited petitioners' joint Forms 1040, U.S. Individual Income Tax Return, for the 2004–09 taxable years (years at issue), all of which were filed after the specified filing dates (including extensions), and determined that the loss deductions they claimed relating to their horse activity should be disallowed.[1] Consequently, by

---

[1] The IRS also determined that petitioners had increased income and expenses on Schedules E, Supplemental Income and Loss, income and expenses for 2004–08, unreported wage income for 2008, unreported qualified dividends for 2004–07, increased net capital losses for 2004, 2005, 2008, and 2009, and increased "other income" for 2004–09, none of which petitioners contested at trial (or on brief). Furthermore, the IRS determined that petitioners were entitled to an increased child tax credit for 2004, an increased recovery rebate for 2008, and an increased make

[*2] Notice of Deficiency dated September 14, 2012, the IRS determined the following deficiencies in petitioners' federal income tax, additions to tax pursuant to section 6651(a)(1),[2] and accuracy-related penalties pursuant to section 6662(a) for the years at issue:

| Year | Deficiency | Additions to Tax / Penalties | |
| --- | --- | --- | --- |
| | | *§ 6651(a)(1)* | *§ 6662(a)* |
| 2004 | $10,155 | $2,539 | $2,031 |
| 2005 | 29,993 | 7,498 | 5,999 |
| 2006 | 19,289 | 4,810 | 3,858 |
| 2007 | 13,578 | 3,395 | 2,716 |
| 2008 | 16,702 | 2,415 | 3,340 |
| 2009 | 11,730 | 2,933 | 2,346 |

After briefing was complete, the parties agreed in a Stipulation of Settled Issues that petitioners are not liable for the accuracy-related penalties. Accordingly, the issues remaining for decision are whether petitioners (1) engaged in their horse activity for profit within the meaning of section 183(a) and (2) are liable for the additions to tax. We resolve both issues in respondent's favor.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The Stipulation of Facts, the Supplemental Stipulation of Facts, and the attached Exhibits are incorporated herein by this reference. Petitioners resided in Louisiana when their Petition was timely filed with the Court.

I.    *Petitioners' Backgrounds*

Petitioners are college graduates who have been married since 1978 and have one daughter (born in 1990).

Mr. Himmel graduated from Southeastern Louisiana University in 1974 with a degree in marketing. The following year he began working at KEM Supply House, Inc. (KEM Supply House), which sold

work/government retiree credit for 2009, none of which petitioners assigned error to in their Petition.

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code (Code), Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Some monetary amounts are rounded to the nearest dollar.

[*3] office supplies, janitorial supplies, paper products, and furniture. At the time of trial, Mr. Himmel had a 30% ownership interest in KEM Supply House, and the remaining ownership interests were held by his mother, older sister, and younger brother. From 1975 to 1990 Mr. Himmel was the sole manager of KEM Supply House. However, after suffering from health problems in 1990, he took a more peripheral role and only generally helped with the business's accounting matters.

Mrs. Himmel graduated from Loyola University in New Orleans in 1977 with a degree in dental hygiene and worked as a full-time dental hygienist from 1977 to 1990. From 1990 to 2008 Mrs. Himmel worked as a part-time dental hygienist. After 2008 she worked only occasionally, substituting for other dental hygienists who were unavailable to work. Additionally, in 2002 Mrs. Himmel's father was diagnosed with Alzheimer's disease, and in 2004 she moved in with him to help care for him until he passed away in April 2011.

II.    *Petitioners' Horse Activity*

Mr. Himmel began caring for horses in his community as a young child in exchange for riding privileges. During his college years he exhibited horses in shows, and he purchased his first horse in 1976. In 1980 he went on to purchase five mares, two of which he sold for a profit.

Since at least 1979 Mrs. Himmel has been involved in the Arabian horse industry, having cared for horses and held committee chair and other leadership positions in various state, regional, and national horse associations. She has also exhibited horses in competitions at the local, regional, national, and international levels, having won some of those competitions.

In 1981 petitioners formed Plantation Arabians, a sole proprietorship, which trains, breeds, boards, and shows horses.

A.    *Petitioners' Business Plans and Expert Advice Pertaining to Plantation Arabians*

Petitioners became friends with fellow breeders and trainers who they had met at horse shows and exchanged industry know-how with. Petitioners met Joel Gangi in 1978, a fellow exhibitor, breeder, and trainer. Since then petitioners and Mr. Gangi have attended shows together and exchanged opinions on techniques for training and showing horses. Petitioners met Gary Dearth at a horse show in 1991. Mr. Dearth had a family farm that successfully bred Arabian horses and had

[*4] done so for over 40 years. Mr. Dearth's business model was to breed, raise, show, and then sell Arabian horses. He advised petitioners to follow a similar business model but on a smaller scale.

Petitioners did not have a written business plan for Plantation Arabians but had an informal plan to breed their own horses, buy horses from others, and then train and show the horses to enhance their sale value. Petitioners also conducted several other activities that earned limited income including boarding, training, hauling, and showing client horses. During the 1980s petitioners' stallions earned stud fees. However, that ended in 1988 after the Arabian Horse Registry of America approved transporting frozen horse semen in 1988 and petitioners' studs were pushed out by better stallions that could be marketed nationally.

Throughout the years at issue petitioners owned and cared for at least 20 horses at Plantation Arabians.[3] Care for the horses was labor intensive and required daily and year-round duties, such as cleaning and mucking out stalls, grooming horses, feeding and watering horses, and tending to pastures.

Most of Plantation Arabians' activities took place on petitioners' property; in 1981 they had purchased undeveloped property at 515 Back Project Road (Back Project property) for $125,000 and built a 900-square-foot residence on the land as well as a 4,000-square-foot barn with ten stalls, a tack room, a wash room, and a 25-foot open bay. Petitioners moved into the residence around 1982 when both structures were completed, and they have lived there since. Also around that time petitioners erected fences throughout the property and developed five pastures.

Around 1988 or 1989 petitioners made improvements to the barn portion of their property, which included adding seven stalls and an attachment to the existing structure which had four stalls and a covered indoor arena. In 1990 petitioners also increased the size of their residence on the property by 1,000 square feet. Additionally, in 2011 petitioners added a lean-to to the barn on the property. Valuations as

---

[3] The number of horses petitioners owned from 2004 to 2009 is unclear from the record. A schedule they provided shows they owned 21 horses that are not currently designated as deceased or sold. However, this schedule does not list the date of death for several other horses marked as deceased, and so they may have had more than 21 at some point from 2004 to 2009 that died after 2009. In addition, they bought at least one other horse in 2006, Halstead Jackson, that is not on this list.

[*5] of December 2009 and September 2015 valued the property, including all improvements, at $550,000 and $570,000, respectively.

Petitioners experienced setbacks operating Plantation Arabians during the years at issue. Hurricane Katrina struck in 2005 and caused water damage to petitioners' indoor training arena. While Hurricane Rita also hit in 2005 and produced significant rainfall, there was no physical damage to the property. In 2006 petitioners incurred $63,782 in expenses for repairing the damage from these storms and received $55,798 in insurance proceeds.

### B. *Time Petitioners Devoted to Plantation Arabians*

Petitioners did not employ full-time help at Plantation Arabians but performed the bulk of the duties themselves. In the 1980s they seasonally hired or offered internships to some veterinarian and agricultural students that attended a local university. In the 1990s they hired a few drivers to haul their horses and gear and set up at shows. During the years at issue they occasionally hired a limited number of part-time employees.

Mr. Himmel spent most of his time working on the farm, and he often began his day at 4 a.m. before leaving for his job at KEM Supply House. He returned home in the mid-afternoon and worked until 8 p.m. or 10 p.m. Mr. Himmel was the only one who trained the horses, but both petitioners rode horses and exhibited them at shows.

Mrs. Himmel similarly worked on the farm before and after her job during the years she worked as a dental hygienist. However, between 2004 and 2011 Mrs. Himmel was less involved in Plantation Arabians' daily activities because she was the primary caretaker for her father. It was not until late spring of 2011 that she began helping with these activities again. As of the trial date, her sole occupation was managing Plantation Arabians.

### C. *Plantation Arabians' Books and Records*

Petitioners maintained a separate checking account, used QuickBooks to record most income and expenses daily, and generally prepared quarterly financial reports. Mrs. Himmel used their personal accounts to pay some of Plantation Arabians' expenses. At yearend Mrs. Himmel reviewed statements from these personal accounts and provided a summary that Mr. Himmel would enter into Plantation Arabians' financial records.

[*6]   D.   *Mr. Himmel's International Arabian Horse Association Judging Scandal*

In addition to competing in shows, Mr. Himmel began judging shows in 1987 to increase Plantation Arabians' profile in the industry. Mr. Himmel worked his way up the judging hierarchy from local show judge to national show judge.  In October 2001 Mr. Himmel judged the most prestigious Arabian horse show, the U.S. National Championship. Unfortunately, he did not enjoy this accomplishment for long because the International Arabian Horse Association (IAHA) fired Mr. Himmel as a judge and accused him of unfairly favoring certain entrants, including Mr. Dearth and Mr. Gangi.  No judge had ever been dismissed from a show; thus, word of the scandal spread quickly throughout the Arabian horse community and negatively affected petitioners' and Plantation Arabians' reputations.

In June 2002 Mr. Himmel filed suit against the IAHA for wrongful dismissal.  In 2005 he received a favorable settlement of $225,000; therein was a stipulation he would be hired to judge a national show again.  In 2010, after much delay, the American Horse Association (AHA)[4] finally satisfied this stipulation and hired him to judge the U.S. National Championship.

As a result of the scandal, Plantation Arabians had a difficult time selling horses, recruiting new clients to train, and placing at horse shows.  In an effort to repair Plantation Arabians' name, Mr. Gangi advised petitioners to purchase an established, successful horse.  In 2006 petitioners purchased a horse, Halstead Jackson, with funds provided by Mr. Himmel's father (through either gift or loan) for $55,000.  Mr. Gangi had trained that horse.

E.   *Plantation Arabians' Financial Performance*

Despite petitioners' informal business plan, they reported only two horse sales in all 14 years of Plantation Arabians' annual operating results.  During the years at issue petitioners sold only one horse (for $14,800 in 2004), and this horse was not one that petitioners had bred.[5]

---

[4] The AHA is the surviving organization after the IAHA merged with the Arabian Horse Registry of America.

[5] According to Mr. Himmel's trial testimony, petitioners sold the horse for $14,800.  Additionally, on brief petitioners assert that they sold the horse for $14,800

**[\*7]**    In addition to joint Forms 1040 for the years at issue, the record includes petitioners' 1993 and 1997–2003 joint Forms 1040, wherein petitioners reported one horse sale in 1998 for $5,280.

The record also includes a spreadsheet petitioners provided to respondent titled "Plantation Arabians Profit Loss 2004 through 2009," which showed "Total Income" of $148,352 and "Total Other Income" of $312,467 during the years at issue. The "Total Income" of $148,352 was from the following sources: (1) "Training" of $74,891; (2) "Board Fees" of $24,409; (3) "Other Income" of $18,871; (4) "Showing Fees" of $12,078; (5) "Hauling" of $13,102; (6) "Winnings" of $1,872; (7) "Judging" of $1,114; (8) "Sale of Tack or Supplies" of $842; (9) "Riding Lessons" of $835; (10) "Feed Sales" of $202; and (11) "Uncategorized Income" of $138.[6] The "Total Other Income" of $312,467 was from the following sources: (1) "Miscellaneous Income" from the settlement received from Mr. Himmel's lawsuit against IAHA of $225,000; (2) "Insurance Proceeds" of $61,762; (3) "Horse Sales" of $14,800; (4) "Rent Income—Trailer" of $9,309; (5) "Interest Income" of $1,304; and (6) "Returned Entries, Etc." of $292.

This spreadsheet also showed that petitioners incurred expenses attributable to Plantation Arabians of $881,372 during the years at issue. Some detailed expenses that made up this total expense amount were as follows:

| Year | Credit Card Interest | Interest Paid | Feed | Horse Shows | Travel | Show Clothes | Veterinary Expenses |
|------|------|------|------|------|------|------|------|
| 2004 | $7,537 | $13,842 | $12,472 | $6,393 | $2,041 | -0- | $2,868 |
| 2005 | 9,260 | 11,923 | 10,925 | 11,635 | 11,947 | $7,589 | 2,299 |
| 2006 | 13,816 | 13,908 | 9,754 | 8,044 | 11,101 | 7,251 | 3,029 |
| 2007 | 17,567 | 5,107 | 10,938 | 11,947 | 5,965 | 6,762 | 7,632 |

---

(and because they purchased the horse for $4,000, the sale resulted in a $10,800 gain). On their 2004 Schedule D, Capital Gains and Losses, however, petitioners reported that they sold the horse for $10,000 (with a cost basis of zero, which therefore resulted in a $10,000 capital gain). *See infra* p. 10.

[6] The 11 items actually total $148,354 because of rounding of 9 of those 11 items.

| [*8]<br>2008 | 18,217 | 5,119 | 14,474 | 20,471 | 19,732 | 2,075 | 13,476 |
|---|---|---|---|---|---|---|---|
| 2009 | 17,162 | 6,438 | 12,538 | 4,498 | 7,951 | 981 | 1,651 |
| Total | $83,559 | $56,337 | $71,101 | $62,988 | $58,737 | $24,658 | $30,955 |

F.  *Petitioners' Other Horse Activities*

After petitioners established Plantation Arabians in 1981, they were involved in two other horse-related endeavors: Arabians de la Bonne Terre and Snaffles, Inc. (Snaffles).

1.  *Arabians de la Bonne Terre*

Around 1985 or 1986 Mr. Himmel and an acquaintance formed a horse breeding investment partnership, Arabians de la Bonne Terre, in which Mr. Himmel held a 50% ownership interest.  Arabians de la Bonne Terre's horse activities took place on petitioners' property, and its activities were not kept separate and apart from Plantation Arabians' horse activities.  Ultimately, Arabians de la Bonne Terre suffered after passive investors abandoned the venture in the wake of tax reform in 1986[7] and left petitioners to absorb multiple horses into Plantation Arabians.  However, no formal transfer was made between the two businesses.

2.  *Snaffles*

Mrs. Himmel wholly owned Snaffles from 1990 to 1994.  Snaffles was a mobile horse-tack supply store that petitioners set up at shows to sell horse-related products such as bridles, saddles, and clothing.  This business was unsuccessful after operating for five years.  Snaffles' sales peaked in 1993 at $53,145, and earned a profit just once in its existence, in 1991, of $4,767.

---

[7] *See* Tax Reform Act of 1986, Pub. L. No. 99-514, § 143, 100 Stat. 2085, 2120 (altering the statutory presumption that an activity is engaged in for profit under section 183(d)).

[*9] III.  *Petitioners' Tax Returns*

Petitioners hired Robert C. Barrett, Jr., a tax attorney and certified public accountant (CPA), to prepare their joint Forms 1040 for the years at issue.  Petitioners provided Mr. Barrett with Plantation Arabians' yearly income and expense statements for the years at issue to help him prepare their joint Forms 1040 for those years.  Petitioners filed (with the assistance of Mr. Barrett) their 2004 joint Form 1040 on November 8, 2008, their 2005 joint Form 1040 on November 18, 2008, their 2006 joint Form 1040 on October 20, 2009, their 2007 joint Form 1040 on November 23, 2009, their 2008 joint Form 1040 on January 4, 2010, and their 2009 joint Form 1040 on May 7, 2011.[8]

Petitioners attached to each joint Form 1040 a Schedule C, Profit or Loss From Business, for Plantation Arabians and listed "Breeding & Show of Arabian Horses" as the principal business.  On the Schedules C for the years at issue petitioners reported in pertinent part the following:

| Year | Gross Income | Depreciation Expense | Interest Expense | Total Expense | Schedule C Profit/(Loss) |
|---|---|---|---|---|---|
| 2004 | $29,920 | $23,077 | $26,070 | $109,432 | ($79,512) |
| 2005 | 33,509 | 40,680 | 23,801 | 165,221 | (131,712) |
| 2006 | 31,417 | 57,181 | 31,776 | 204,935 | (173,712) |
| 2007 | 27,246 | 22,141 | 43,460 | 182,331 | (155,085) |
| 2008 | 16,242 | 42,645 | 35,462 | 219,111 | (202,869) |
| 2009 | 10,165 | 32,965 | 31,317 | 134,630 | (124,465) |
| **Total** | **$148,499** | **$218,689** | **$191,886** | **$1,015,660** | **($867,355)** |

---

[8] The extended date to file was August 28, 2006, for their 2004 joint Form 1040, *see* I.R.S. Notice 2006-20, 2006-1 C.B. 560 (further postponing the deadline for certain taxpayer acts, such as filing returns and other documents, from February 28, 2006, through August 28, 2006); October 15, 2006, for their 2005 joint Form 1040; October 15, 2007, for their 2006 joint Form 1040; October 15, 2008, for their 2007 joint Form 1040; October 15, 2009, for their 2008 joint Form 1040; and October 15, 2010, for their 2009 joint Form 1040.

**[\*10]** Petitioners also attached to their 2004 joint Form 1040 a Schedule D which reported the sale of a horse, on June 4, 2004, for $10,000, and a resulting $10,000 gain.

Additionally, attached to each of petitioners' joint Forms 1040 for 1993 and 1998–2003 are Schedules C—each reporting losses attributable to Plantation Arabians in the following amounts: $39,787 for 1993, $49,937 for 1998, $77,677 for 1999, $83,022 for 2000, $70,201 for 2001, $77,311 for 2002 and $94,772 for 2003.

IV.    *Audit*

The IRS selected petitioners' joint Forms 1040 for the years at issue for audit.  On June 1, 2011, while the audit was still ongoing, Mr. Barrett (who was petitioners' authorized representative for the audit and their counsel of record in this case) and IRS Group Manager Carla Smith executed a Form 872, Consent to Extend the Time to Assess Tax, extending the time to April 15, 2012, for the IRS to assess tax for 2004 and 2005.  Similarly, on August 31, 2011, Mr. Barrett and Ms. Smith executed a second Form 872, extending the time to June 15, 2012, for the IRS to assess tax for 2004 and 2005.  Finally, on January 13, 2012, petitioners and an IRS Appeals Officer[9] executed a third Form 872, extending the time to January 4, 2013, for the IRS to assess tax for 2004–07.

OPINION

I.    *Burden of Proof*

In general, the Commissioner's determinations set forth in a Notice of Deficiency are presumed correct, and, except for the burden of production in any court proceeding with respect to an individual taxpayer's liability for any "penalty, addition to tax, or additional amount," *see* § 7491(c), the taxpayer bears the burden of proving that the Commissioner's determinations are erroneous, *see* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933).  Tax deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934).

---

[9] The IRS Appeals Officer's signature is illegible, and the record does not indicate who this person is.

**[\*11]** Petitioners allege that the burden of proof should shift to respondent pursuant to section 7491(a) because they have "introduced credible evidence concerning [their] profit motive." Under section 7491(a), if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining his or her federal income tax liability and meets certain other requirements, the burden of proof shifts from the taxpayer to the Commissioner as to that factual issue. The operation of the section 7491(a) burden-shifting scheme, however, "is irrelevant when both parties have met their burdens of production and the preponderance of the evidence supports one party." *Brinkley v. Commissioner*, 808 F.3d 657, 664 (5th Cir. 2015) (and cases cited thereat), *aff'g* T.C. Memo. 2014-227.[10] Here, both parties have satisfied their burdens of production and, as outlined below, the preponderance of the evidence favors respondent. Thus, whether the burden of proof remains on petitioners is irrelevant.

II.    *Certain Issues Not Pursued or Explicitly Conceded on Brief*

On brief petitioners assert only that (1) Plantation Arabians operated primarily for profit, (2) they are not liable for the additions to tax, and (3) they are not liable for the accuracy-related penalties.[11] We conclude, therefore, that petitioners have abandoned any argument or contention pertaining to the statute of limitations for their 2004–07 taxable years. *See McLaine v. Commissioner*, 138 T.C. 228, 243 (2012); *Mendes v. Commissioner*, 121 T.C. 308, 312–13 (2003) (and cases cited thereat); *see also* Rule 151(e)(4) and (5) (requiring that a party's brief set forth and discuss the points and arguments on which the party relies).

However, assuming petitioners timely raised the statute of limitations for 2004–07, we find that the IRS timely issued the September 14, 2012, Notice of Deficiency to them. Respondent produced three consent forms (i.e., Forms 872) with respect to petitioners' 2004 and 2005 joint Forms 1040. The first consent form extended the period of limitations on assessment to April 15, 2012. The second consent form, executed before the expiration of the previously extended date of April 15, 2012, further extended the period of limitations on assessment to June 15, 2012. The third consent form, executed before the expiration

---

[10] We note that, pursuant to *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971), we follow the relevant precedent of the court of appeals to which an appeal would generally lie, and in this case that would be the U.S. Court of Appeals for the Fifth Circuit.

[11] After briefing was complete, respondent conceded the penalties issue.

**[\*12]** of the previously extended date of June 15, 2012, further extended the period of limitations on assessment to January 4, 2013.[12] Additionally, petitioners do not contend, and we do not find, that any of the consent forms were invalid. Accordingly, we hold that the September 14, 2012, Notice of Deficiency was timely.

III. *Section 183*

Generally, the Code allows deductions for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business or for the production of income. §§ 162(a), 212(1). Under section 183, if an activity is not engaged in for profit, such as an activity primarily carried on for sport, as a hobby, or for recreation, then no deduction attributable to that activity is generally allowed except as provided for in subsection (b).[13] *See* Treas. Reg. § 1.183-2(a).

Whether the requisite profit objective existed is determined by looking at all the surrounding facts and circumstances. Treas. Reg. § 1.183-2(b); *see also Keanini v. Commissioner*, 94 T.C. 41, 46 (1990); *Estate of Power v. Commissioner*, T.C. Memo. 1983-552, 1983 Tax Ct. Memo LEXIS 237, at \*18, *aff'd*, 736 F.2d 826 (1st Cir. 1984). We accord greater weight to objective facts than to subjective statements of intent. Treas. Reg. § 1.183-2(a); *see also Thomas v. Commissioner*, 84 T.C. 1244, 1269 (1985), *aff'd*, 792 F.2d 1256 (4th Cir. 1986); *Estate of Power*, 1983 Tax Ct. Memo LEXIS 237, at \*19. In this case we gauge the profit intent of Plantation Arabians from that of petitioners, its sole owners. Evidence from years outside the years at issue is relevant to the extent it creates inferences regarding the taxpayer's requisite profit objective in the subject years. *See, e.g.*, *Smith v. Commissioner*, T.C. Memo. 1993-140, 1993 Tax Ct. Memo LEXIS 138, at \*26.

Pursuant to section 183(d), an activity consisting in major part of breeding, training, showing, or racing horses is presumed to be engaged in for profit if the activity produces gross income in excess of deductions for any two of the seven consecutive years which end with the taxable year, unless the Commissioner establishes to the contrary. *See Wadlow*

---

[12] Additionally, the third consent form extended the period of limitations to January 4, 2013, for 2006 and 2007.

[13] Section 183(b) allows deductions that would have been allowable had the activity been engaged in for profit but only to the extent of gross income derived from the activity (reduced by deductions attributable to the activity that are allowable without regard to the whether the activity was engaged in for profit).

**[\*13]** *v. Commissioner*, 112 T.C. 247, 250 (1999). Plantation Arabians never produced gross income in excess of deductions for purposes of invoking the presumption. Accordingly, the presumption does not apply here.

Treasury Regulation § 1.183-2(b) provides a nonexclusive list of nine factors to consider in evaluating a taxpayer's profit objective. These factors are: (1) the manner in which the taxpayer carried on the activity, (2) the expertise of the taxpayer or his or her advisers, (3) the time and effort spent by the taxpayer in carrying on the activity, (4) the expectation that the assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or loss with respect to the activity, (7) the amount of occasional profits earned, if any, (8) the financial status of the taxpayer, and (9) whether elements of personal pleasure or recreation were involved. *See also Filios v. Commissioner*, 224 F.3d 16, 21–22 (1st Cir. 2000), *aff'g* T.C. Memo. 1999-92. No single factor or group of factors is determinative, and more weight may be given to some factors than others. *Golanty v. Commissioner*, 72 T.C. 411, 426 (1979), *aff'd*, 647 F.2d 170 (9th Cir. 1981) (unpublished table decision); *Vitale v. Commissioner*, T.C. Memo. 1999-131, 1999 Tax Ct. Memo LEXIS 181, at \*23, *aff'd*, 217 F.3d 843 (4th Cir. 2000) (unpublished table decision); *see also Green v. Commissioner*, T.C. Memo. 1989-436, 1989 Tax Ct. Memo LEXIS 435, at \*38–39 (noting that all nine factors do not necessarily apply in every case); Treas. Reg. § 1.183-2(b). We examine each of these factors in turn.

A.     *Manner in Which the Activity Is Conducted*

The fact that a taxpayer conducts an activity in a businesslike manner may indicate a profit motive. Treas. Reg. § 1.183-2(b)(1). In making this determination we consider whether the taxpayer (1) maintained complete and accurate books and records for the activity; (2) prepared a business plan; (3) conducted the activity in a manner substantially similar to comparable activities that were profitable; (4) changed operating procedures, adopted new techniques, or abandoned unprofitable methods in a manner consistent with an intent to improve profitability; and (5) in the case of horse breeding and sales, ran a consistent and concentrated advertising program. *Donoghue v. Commissioner*, T.C. Memo. 2019-71, at \*24–25 (and cases cited thereat), *aff'd*, No. 19-2265, 2021 U.S. App. LEXIS 38575 (1st Cir. June 2, 2021).

**[*14]**     1.     *Books and Records*

We first address whether petitioners maintained complete and accurate books and records. Under this factor we consider whether the books and records were maintained with the objective of making a profit, not merely whether the taxpayer maintained books and records for tax purposes. *Judah v. Commissioner*, T.C. Memo. 2015-243, at *34 (citing *Betts v. Commissioner*, T.C. Memo. 2010-164). A taxpayer must maintain books and records for the purpose of cutting expenses, increasing profits, and evaluating the overall performance of the operation to satisfy this factor. *Id.*

Petitioners maintained a separate checking account, and Mr. Himmel used QuickBooks to record income and expenses daily and "probably ran a financial report quarterly." Mrs. Himmel, however, paid some of Plantation Arabians' expenses with their personal credit card and from their joint bank account. At yearend Mrs. Himmel summarized the expenses she paid with her personal accounts but only did this annual reconciliation for tax purposes. Additionally, no evidence in the record suggests that petitioners tracked direct and indirect expenses for each individual horse. We therefore conclude that petitioners failed to maintain books and records with the objective of making a profit.

2.     *Comparable Activities*

A profit objective may be indicated when a taxpayer conducts the activity in a manner substantially similar to other profitable activities of the same nature. Treas. Reg. § 1.183-2(b)(1); *see also Engdahl v. Commissioner*, 72 T.C. 659, 666–67 (1979).

Petitioners' friend Mr. Dearth operates a family farm that has successfully bred Arabian horses for over 40 years, but his successful operation differs from petitioners' in several ways. First, unlike Mr. Dearth, petitioners have not frequently sold horses; during the years at issue petitioners sold one horse for $14,800. Among the 14 years of Forms 1040 in the record, petitioners reported only one other horse sale, in 1998 for $5,280.

Furthermore, Mr. Dearth's operation responded to the 2008 recession by reducing its inventory of horses from 84 to 18 in order to reduce overhead expenses and even gave away some horses for free when it could not sell them. Petitioners experienced multiple financial setbacks but failed to take the same cost-cutting approach. Mr. Himmel

**[\*15]** testified that his reputation was so harmed by the judging scandal that he could no longer sell horses or get fees for training clients' horses. Additionally, petitioners maintained at least 20 horses throughout the years at issue, even during the 2008 recession, despite their name being essentially black-balled from the Arabian horse community for several of the years at issue.

Petitioners failed to sell horses and failed to cut expenses by disposing of horses like Mr. Dearth's comparable successful activity. Thus, we conclude that petitioners did not conduct the activity in a manner substantially similar to that of other profitable activities of the same nature.

3.     *Business Plan*

Petitioners contend that although they did not have a written business plan, they nonetheless followed an informal business plan. We have previously held that a written financial plan was not required for a horse farm if a business plan was evidenced by action. *Phillips v. Commissioner*, T.C. Memo. 1997-128, slip op. at 14–15. But we have also found that a business plan was insufficient because it was "devoid of any meaningful financial analysis." *Betts*, T.C. Memo. 2010-164, slip op. at 14–15 (finding the business plan was insufficient because the taxpayer failed to "prepare any business or profit plans, profit or loss statements, balance sheets, or financial break-even analyses" (quoting *Dodge v. Commissioner*, T.C. Memo. 1998-89, slip op. at 10, *aff'd*, 188 F.3d 507 (6th Cir. 1999) (unpublished table decision)).

Petitioners contend that their original business plan was to purchase mares, breed them, train and show them, and then sell them for profit. Petitioners also contend that they changed their business plan after the judging scandal to prioritize rebuilding their reputation. They argue that their business plan changed to: (1) sue the IAHA; (2) acquire successful Arabian horses and successfully show them on the national level; and (3) breed and sell horses again. We cannot find petitioners had a complete business plan evidenced by action because they failed to perform an essential aspect of their plan: selling horses. Petitioners did not prepare profit plans, break-even analyses, or financial projections; however, they did produce partial quarterly profit and loss statements, and Mr. Himmel entered many expenses into QuickBooks daily.

**[\*16]** Therefore, although petitioners did not have a written business plan, they had a basic plan for profit that was partially evidenced by action. This issue is neutral.

### 4. *Changing Operating Procedures to Improve Profitability*

Next, we consider whether petitioners changed operating procedures, cut expenses, or abandoned unprofitable lines of business to improve profitability. *See Judah*, T.C. Memo. 2015-243, at \*37. Petitioners contend that they changed their business plan after the judging scandal. We disagree. The alleged revised business plan is almost identical to petitioners' original one; the only difference from the alleged revised plan is that they first took steps to restore their reputation in the industry. Just as before, they still sought to acquire and breed horses, train and show them to increase their value, and then sell them. Moreover, they were unprofitable before the scandal,[14] and so this business plan does not address or rectify the underlying issue.

Petitioners also contend that they changed certain aspects of their operation to improve profitability. Petitioners argue that they incorporated other income-producing activities such as boarding, training, hauling, and showing clients' horses to improve profitability. Petitioners additionally contend that they started cultivating hay to cut feed expenses and that they abandoned the unprofitable line of business of attempting to earn stud fees. Petitioners, however, undertook these changes in years prior to the years at issue. Thus, the changes were not undertaken to improve profitability during the years at issue.

Finally, petitioners' Schedules C report that their operating expenses for 2004–09 were $109,432, $165,771, $204,935, $182,331, $219,111, and $134,630, respectively. There is no meaningful trend showing that they reduced expenses. Thus, we conclude that petitioners did not change their business plan or their operating procedures to either increase income or reduce expenses.

---

[14] With respect to taxable years before 2005, when Mr. Himmel and the IAHA entered into a settlement that legally ended the scandal, aside from petitioners' 2004 Schedule C their only other Schedules C in the record are their 1993 Schedule C and 1997–2003 Schedules C. Petitioners reported losses every year on these Schedules C, resulting in an average loss of $65,463 and a total loss of $523,705.

[*17]     5.     *Advertising*

Petitioners contend that they advertised their horses in a manner consistent with operating a business for profit in the Arabian horse industry. We have held that "advertising at horse shows, by word of mouth, in print media, and by participation in horse shows may indicate an intent to make profit." *Betts*, T.C. Memo. 2010-164, slip op. at 17 (citing *Engdahl*, 72 T.C. at 667). Petitioners advertised their horses mainly by participating in horse shows and by word of mouth via a positive reputation in the industry, which included judging horse shows and assuming leadership positions in various Arabian horse organizations. Petitioners' advertising method was appropriate in their industry; thus, this favors petitioners' position.

Overall, however, we find that Plantation Arabians was not carried on in a businesslike manner consistent with an activity engaged in for profit. Accordingly, this factor weighs in respondent's favor.

B.     *Expertise of Petitioners or Their Advisors*

A taxpayer's own expertise, research, and extensive study of an activity, or consultation with experts may indicate a profit objective. Treas. Reg. § 1.183-2(b)(2). This factor focuses on whether the taxpayer "received advice from the experts as to the accepted principles and economics of profitably running a business and not merely the general advice that a horse enthusiast would seek in training and showing horses as a hobby." *Betts*, T.C. Memo. 2010-164, slip op. at 19 (and cases cited threat).

Petitioners did not employ any specialized workers to help manage the ranch. Their only employees were students that attended the local university that were hired seasonally in the 1980s, drivers that were hired occasionally to haul trucks and set up at horse shows in the 1990s, and a limited number of part-time people throughout the years at issue.

Petitioners contend that they consulted with two individuals with extensive experience with Arabian horse operations, Mr. Dearth and Mr. Gangi; however, petitioners did not produce evidence that credibly demonstrates they received any advice that was not merely general advice a horse enthusiast would seek for a hobby. Petitioners never hired Mr. Dearth or Mr. Gangi as a professional consultant. Moreover, Mr. Dearth did not meet petitioners until 1991—a decade after Plantation Arabians was established. Thus, we do not find that

[*18] petitioners consulted with experts in a manner that indicates a profit objective.

Additionally, petitioners themselves possess no formal training in agriculture or horse breeding; instead, they possess undergraduate degrees in marketing and dental hygiene. Indeed, Mrs. Himmel has been involved in the Arabian horse industry for decades, has cared for horses, has held committee chair positions in horse associations, and has won competitions at the local, regional, and national level. However, she lacks business expertise as to the financial aspects of running an Arabian horse farm. Meanwhile, Mr. Himmel had some experience in the Arabian horse industry before starting Plantation Arabians and has experience in business generally. He purchased and resold two horses for a profit before forming Plantation Arabians. Furthermore, while operating Plantation Arabians he accumulated years of experience training, boarding, and showing horses and even judging horse competitions on a national level. He also has general business experience co-owning and managing a successful office supply company since 1975.

Having said that, we find that petitioners have not credibly consulted with experts in the industry to improve profitability, and their own experience does not demonstrate that they possess the requisite financial expertise in the Arabian horse industry. However, we do find that petitioners possess considerable knowledge and experience training, judging, caring for, and breeding horses, including the technical aspects of artificial insemination. Thus, on balance, we find that this factor is neutral.

C.    *Petitioners' Time and Effort Devoted to the Activity*

The fact that a taxpayer devotes much of his or her personal time and effort to carrying on an activity may indicate a profit objective, particularly if the activity does not involve substantial personal or recreational aspects. Treas. Reg. § 1.183-2(b)(3). But the time and effort spent on an activity that has substantial personal and recreational aspects may be due to a taxpayer's enjoyment of the activity rather than an objective of making a profit. *Judah*, T.C. Memo. 2015-243, at *43.

Petitioners spent a significant amount of time on their horse activity. We find that Mr. Himmel credibly testified that he spent most

**[\*19]** of his time working at Plantation Arabians.[15]  Mrs. Himmel also spent a significant amount of time working at Plantation Arabians, although less so during the years at issue because she cared for her sick father.  Petitioners had no full-time employees and personally operated a farm with more than 20 horses during the years at issue, requiring a great deal of time and care.  Petitioners credibly testified as to the amount of time they spent cleaning and mucking out stalls, and grooming, feeding, and watering horses.  Although these acts have significant personal and recreational aspects, we find that this factor weighs in petitioners' favor.

> D.     *Expectation That Assets Used in the Activity May Appreciate*

An expectation that assets used in the activity will appreciate and therefore may produce an overall profit may indicate a profit motive even if the taxpayer derives no operational profit.  Treas. Reg. § 1.183-2(b)(4).  However, a profit objective may be inferred from the expected appreciation of assets only where the appreciation exceeds operating expenses and would be sufficient to recoup accumulated losses of prior years.  *Carmody v. Commissioner*, T.C. Memo. 2016-225, at \*28 (and cases cited thereat).  A vague and unauthenticated notion that assets are appreciating does not constitute a bona fide expectation that the appreciation will offset past and future losses.  *La Musga v. Commissioner*, T.C. Memo. 1982-742, 1982 Tax Ct. Memo LEXIS 154, at \*15–16.

Petitioners produced no reliable evidence of the current fair market value of their horses or evidence that their value has increased over time.  Petitioners contend that their one horse sale during the years at issue demonstrates that they expected their value to increase.  But we find one sale is not sufficient to determine the value of their entire herd or whether it has appreciated.  Because petitioners introduced no

---

[15] Mr. Himmel testified that he spent 70% of his time at Plantation Arabians and 30% of his time at KEM Supply House.  Respondent argues that Mr. Himmel's testimony is contradicted by KEM Supply House's Schedules E, Compensation of Officers, which report that Mr. Himmel devoted 60% or more of his time to KEM Supply House in 2005 and 2007.  However, we do not agree that this necessarily contradicts Mr. Himmel's testimony.  Mr. Himmel may have reported his time at KEM Supply House as a percentage of a typical 40-hour per week job.  Thus, Mr. Himmel may have worked a little over 20 hours per week at KEM Supply House, i.e., 60% of a full-time job, and approximately 40 hours at Plantation Arabians, which would be consistent with his credible testimony.

**[\*20]** other evidence of their herd's value, we cannot find that they expected it to appreciate.

Petitioners also contend that they expected their holding of the Back Project property to appreciate. Petitioners bought the 25-acre Back Project property when it was bare land in 1981 and began constructing their residence and barn that same year. We find petitioners purchased their Back Project property primarily to operate a horse breeding farm and thus the land's appreciation may be considered. *See* Treas. Reg. § 1.183-1(d)(1). However, petitioners' personal residence constructed on that property may not be considered in the valuation because their residence is separate from their horse activity.

On the basis of the record before us, we are unable to determine the value of the Back Project property that does not include the value of the portion of the land with petitioners' personal residence. Petitioners produced (1) a valuation as of December 2009 stating that the land, house, indoor arena, and other improvements on their property were worth $550,000 and (2) a valuation as of September 2015 stating that the land, house, indoor arena, and other improvements on their property were worth $570,000. However, when petitioners purchased the Back Project property it was bare land with no improvements, and they failed to produce complete evidence as to the original cost of these improvements in order for us to determine their appreciation.[16] Given that the valuations each included petitioners' personal residence, which is not properly attributable to their horse activity, we cannot determine the appreciation of the Plantation Arabians property. Accordingly, this factor weighs in respondent's favor.

E. *Success in Carrying On Other Similar or Dissimilar Activities*

The fact that a taxpayer engaged in similar activities and converted them to profitable enterprises may indicate that the taxpayer

---

[16] On brief petitioners assert that the costs of improvements to the property are accounted for by two entries on a depreciation schedule—one entry dated October 10, 1982 (of $45,920), and another entry dated December 1, 1990 (of $31,115). However, no entries on this schedule indicate the cost of the improvements Mr. Himmel testified were made in 2011, and there are at least three other entries on the schedule indicating "Improvements" or "Barn Improvement" dated March 1, 1983, December 1, 1984, and June 1, 1993, that petitioners do not account for. Thus, we find that the cost of improvements based on this schedule is incomplete and unreliable.

**[\*21]** engaged in the present activity for profit, even though it is presently unprofitable. Treas. Reg. § 1.183-2(b)(5); *see also Lundquist v. Commissioner*, T.C. Memo. 1999-83, slip op. at 24, *aff'd*, 211 F.3d 600 (11th Cir. 2000) (unpublished table decision). Petitioners have carried on two other businesses related to horses, Arabians de la Bonne Terre and Snaffles, in the past, but both were unsuccessful and ended after only a handful of years when it was clear they were no longer viable businesses. Plantation Arabians, however, has sustained losses for at least 14 years and yet petitioners continued with operations. Petitioners' persistence through Plantation Arabians' unprofitability is a strong indicator that they were not engaged in this horse activity for profit during the years at issue. Accordingly, this factor weighs in favor of respondent.

F. *Petitioners' History of Income or Losses With Respect to the Activity*

A taxpayer's history of income or loss with respect to an activity may indicate the presence or absence of a profit motive. Treas. Reg. § 1.183-2(b)(6); *see also Golanty*, 72 T.C. at 426. A series of losses during the initial or startup stage of an activity does not necessarily indicate that the activity is not engaged in for profit, but losses that extend beyond the customary startup stage may. Treas. Reg. § 1.183-2(b)(6); *see also Engdahl*, 72 T.C. at 669. The goal, however, must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup losses incurred in the intervening years. *See Bessenyey v. Commissioner*, 45 T.C. 261, 274 (1965), *aff'd*, 379 F.2d 252 (2d Cir. 1967).

Plantation Arabians began in 1981, but petitioners did not report a net profit with respect to Plantation Arabians in 1993 or 1997–2003; to wit, they have not reported a net profit since 1990.[17] Furthermore, they did not report a net profit for any of the years at issue. As reported on their Schedules C, petitioners reported a total loss of $1,390,866 for operating Plantation Arabians in those 14 years (1993, 1997–2003, and the years at issue).

Petitioners contend that the total loss reported for Plantation Arabians on their Schedules C is overstated because depreciation, taxes, and interest are not out-of-pocket expenses. Petitioners, however, have not demonstrated that any of the expenses they reported on

---

[17] The record does not include petitioners' joint Forms 1040 for 1994–96.

[*22] Schedules C were otherwise deductible, and they incurred large annual losses. They reported cumulative depreciation expenses of $218,689 and total cumulative losses of $867,355 on their Schedules C for the years at issue. *See supra* p. 9. Even if we reduce petitioners' cumulative losses by their cumulative depreciation expenses, petitioners would still average a loss of $108,111 for each year at issue.

Furthermore, petitioners contend that their history of continuing losses does not indicate their horse activity is not engaged in for profit because the losses resulted from a series of setbacks that occurred during the years at issue, including Mr. Himmel's judging scandal and health problems, Hurricanes Rita and Katrina, and the 2008 recession. Petitioners reported losses in the years prior to Mr. Himmel's judging dismissal (1993 and 1998–2000) of $39,787, $49,937, $77,677, and $83,022, respectively. Plantation Arabians was established in 1981; thus, this trend of losses began well after the recognized 5-to-10-year startup phase for a horse-breeding activity. *See Engdahl*, 72 T.C. at 669. Petitioners' losses in Plantation Arabians may have been magnified by the aforementioned setbacks, but the history of losses predates them. Accordingly, this factor weighs in respondent's favor.

G.    *Amount of Occasional Profits*

The amount of profits in relation to the amount of losses incurred may provide a useful criterion in determining the taxpayer's intent. Treas. Reg. § 1.183-2(b)(7); *see also Giles v. Commissioner*, T.C. Memo. 2006-15, slip op. at 41. A taxpayer's belief that he or she could one day earn a substantial profit from his or her activity may indicate a profit objective if that belief is adequately supported. *See Giles*, T.C. Memo. 2006-15, slip op. at 42; *see also* Treas. Reg. § 1.183-2(b)(7).

Petitioners have not generated a substantial profit. Petitioners contend that they earned an $81,000 profit in 2005, when they received a $225,000 legal settlement from IAHA after Mr. Himmel sued them for wrongful termination as a judge. Respondent argues that this income is not properly attributable to the horse activity because the lawsuit derives from Mr. Himmel's dismissal as a judge in a case where he was the named plaintiff in his individual capacity. Even if this income was attributable to Plantation Arabians, it still did not have a substantial profit during the years at issue, with losses totaling $867,355 during those years.

**[*23]** Petitioners also contend that Plantation Arabians has resumed breeding horses and they are optimistic about the farm's future profit opportunities. However, the most petitioners have sold a horse for since 1993 is $14,800, and so they have not produced or sold a horse that would generate substantial revenue. Thus, petitioners' alleged belief is not adequately supported. Accordingly, this factor weighs in respondent's favor.

### H. *Petitioners' Financial Status*

A lack of substantial income from sources other than the activity may indicate that the activity is engaged in for profit. Treas. Reg. § 1.183-2(b)(8); *see Helmick v. Commissioner*, T.C. Memo. 2009-220, slip op. at 32. In contrast, the fact that a taxpayer derives substantial income from sources other than the activity (particularly if losses from the activity generate substantial tax benefits) may indicate that the taxpayer is not engaged in the activity for profit, especially if personal or recreational elements are involved. Treas. Reg. § 1.183-2(b)(8).

It is undisputed that Mr. Himmel earned a salary from KEM Supply House for each year at issue ranging from $57,425 in 2004 to $89,100 in 2009. Petitioners also earned rental income from a mobile home and a real estate partnership of $6,224, $4,392, $2,522, $4,717, $6,469, and $2,546 for 2004–09, respectively. Mrs. Himmel is a dental hygienist who previously worked full time but worked only occasionally during the years at issue, earning $20,647 and $4,456 in 2004 and 2005, respectively.

Section 183 does not apply just to wealthy individuals as even taxpayers with modest tax liabilities can have a motive to shelter those liabilities. *Helmick*, T.C. Memo. 2009-220, slip op. at 33. In this instance petitioners' claimed losses allowed them to shield their other income from tax and significantly reduced the after-tax cost of their horse activity. *See Hillman v. Commissioner*, T.C. Memo. 1999-255, slip op. at 24–25; *Sullivan v. Commissioner*, T.C. Memo. 1998-367, slip op. at 35, *aff'd*, 202 F.3d 264 (5th Cir. 1999) (unpublished table decision). Accordingly, this factor weighs in favor of respondent's position.

### I. *Elements of Personal Pleasure or Recreation*

The presence of personal motives or recreational elements in carrying on an activity may indicate that the activity is not engaged in for profit. Treas. Reg. § 1.183-2(b)(9). However, the fact that the taxpayer derives personal pleasure from engaging in the activity does

**[\*24]** not show that the taxpayer lacks a profit objective if other evidence shows the activity is conducted for profit. *Id.* "[A] business will not be turned into a hobby merely because the owner finds it pleasurable; suffering has never been made a prerequisite to deductibility." *Jackson v. Commissioner*, 59 T.C. 312, 317 (1972); *see also Giles*, T.C. Memo. 2006-15, slip op. at 33. But if the chance for profit is small relative to the potential for gratification, the latter may emerge as the primary motivation for the activity. *See Annuzzi v. Commissioner*, T.C. Memo. 2014-233, at \*32 (citing *White v. Commissioner*, 23 T.C. 90, 94 (1954), *aff'd per curiam*, 227 F.2d 779 (6th Cir. 1955)).

Petitioners readily admit that they both love Arabian horses and certainly enjoy training and showing horses. Arabian horses have been a part of Mr. Himmel's life since a young age, and they have been a part of Mrs. Himmel's life for decades. Petitioners have also developed relationships and friendships with fellow trainers, owners, and horse enthusiasts at shows and through their participation in Arabian horse organizations. Accordingly, this factor weighs in respondent's favor.

J.     *Conclusion*

Of the nine factors listed in Treasury Regulation § 1.183-2(b), seven factors favor respondent, one factor favors petitioners, and one factor is neutral. After weighing the factors and the facts and circumstances of this case, we hold that petitioners did not have an actual and honest objective to operate Plantation Arabians for profit during the years at issue.

Accordingly, we sustain the IRS's disallowance of petitioners' claimed loss deductions attributable to Plantation Arabians for the years at issue on the ground that they did not engage in their horse activity for profit within the meaning of section 183.

IV.     *Section 6651(a)(1) Additions to Tax*

Section 6651(a)(1) authorizes the imposition of an addition to tax if a taxpayer fails to file his or her income tax return by the due date (including any extension of time for filing). As indicated *supra* p. 10, the Commissioner bears the burden of production with respect to any addition to tax. § 7491(c). The Commissioner satisfies his burden of production by providing sufficient evidence to show that the taxpayer filed his or her tax return late. *Wheeler v. Commissioner*, 127 T.C. 200, 207–08 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008); *Higbee v. Commissioner*, 116 T.C. 438, 447 (2001).

**[\*25]** The record includes petitioners' joint Forms 1040 for the years at issue—each of which was filed past the specified filing date for the respective year, including extension. Respondent has therefore met his burden of production with respect to the additions to tax under section 6651(a)(1) for the years at issue.

Application of the section 6651(a)(1) addition to tax may be avoided if the taxpayer shows that the failure to timely file was due to reasonable cause and not due to willful neglect. *See Higbee*, 116 T.C. at 446–47; *see also* § 6651(a)(1). "If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause." Treas. Reg. § 301.6651-1(c)(1). The taxpayer can show that he or she did not act with "willful neglect" if he or she can "prove that the late filing did not result from a 'conscious, intentional failure or reckless indifference.'" *Niedringhaus v. Commissioner*, 99 T.C. 202, 221 (1992) (quoting *United States v. Boyle*, 469 U.S. 241, 245–46 (1985)). The burden of showing reasonable cause under section 6651(a)(1) remains with petitioners. *See Higbee*, 116 T.C. at 447–48.

Petitioners contend that their failure to timely file was due to reasonable cause and not due to willful neglect; however, they fail to articulate any specific reason for the delays. Petitioners merely state that they worked with a CPA and a tax attorney in the preparation of their joint Forms 1040 and maintained adequate books and records. Furthermore, Mrs. Himmel was distracted during the years at issue because she acted as a full-time caregiver for her father, who had Alzheimer's disease. While we are sympathetic to Mrs. Himmel's situation, a taxpayer's selective inability to perform his or her tax obligations while performing his or her regular business and personal activities does not excuse his or her failure to file. *See Godwin v. Commissioner*, T.C. Memo. 2003-289, slip op. at 22–23. Accordingly, we hold that petitioners did not have reasonable cause for failing to timely file their joint Forms 1040 for the years at issue, and we sustain the section 6651(a)(1) additions to tax determined by the IRS.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*